THOMAS M. SMITH v. ÆTNA LIFE INSURANCE COMPANY.

(Filed 9 April, 1930.)

**Insurance K a — Evidence of insurer's knowledge of substitute rule amounting to a waiver held sufficient to be submitted to the jury.**

Where an insurance company through its agents issues a policy of group insurance knowing at the time of a rule of the union of which the group were members, which rule was recognized by the employer, whereby if an employee did not work another worker could be substituted in his place, provided that he work at least one day out of a period of ninety days, or if the insurer with knowledge of such substitute rule receives premiums and by its acts, conduct, transactions or declarations treats the policy as still in force, the insurer waives a provision in regard to employees covered by the policy to the contrary, and in this case *held:* there was sufficient evidence of such knowledge and waiver on the part of the insurer or its agents to have been submitted to the jury, and defendant's motion as of nonsuit should not have been granted.

APPEAL by plaintiff from *Daniels, J.,* at Second January Term, 1930, of WAKE. Reversed.

This was an action brought by plaintiff against the defendant on 27 November, 1929, in the city court of Raleigh, to recover the sum of $300 on a "group insurance policy." In the city court plaintiff was nonsuited and appealed to the Superior Court and was again nonsuited and appealed to this Court.

The case involved a class of insurance known as "group insurance." The evidence on the part of plaintiff was to the effect that the plaintiff started to work for the *News and Observer* in September, 1920, and

handled the linotype metal that goes in the pot, and the magazines. On 22 August, 1927, he obtained license to practice law, but continued to work for the *News and Observer*. In April, 1928, he opened a law office in the Lawyers' Building. He spent from 9 o'clock in the morning until 2:30 in his law office and went to work at 3 o'clock and worked from then until 11 o'clock for the *News and Observer*. In January, 1929, he had his law office open for the practice of law. He worked January 4, 5, 6 and 7 in 1929, and two days in March, the 17th and 22d, for the *News and Observer*. In June, 1929, he worked one week, from the 14th to 21st of June. Out of this week's pay the *News and Observer* deducted from his pay the insurance premium, which was the method agreed upon by all the parties. The *News and Observer* employees are all union men, belonging to the Typographical Union. There was a substitute rule, when he did not work a substitute could work in his place. Mr. Harvey Eason was manager for the group division of defendant for North Carolina, and knew of this rule; so did Mr. Vick Moore, who had been manager of the *News and Observer* and who signed the application as "Soliciting Agent," and who wrote the insurance for defendant. The matter was discussed with the agent of defendant, the question of substitute, and it was explained to the agent in regard to the priority rule, and the agent stated that the insurance would be good just the same if they were regularly employed and had a substitute. The substitute was not protected by the policy.

The agent of defendant company knew that any one could substitute a man in his place, which was done by plaintiff. The rule was to the effect that the employee had to work one day out of 90 to hold the seniority rights. The other 89 days the employee could do as he pleased, just so one went and worked a day, but one could not work for another printing company.

The plaintiff testified, in part: "Q. Mr. Allen asked you about the seniority rights. At the time the agent of the Ætna Life Insurance Company went to the News and Observer Company in 1926-27, did Mr. Spears go into details and explain what seniority rights meant to the employees? A. Yes, and they explained as long as a man paid his premiums he would be entitled to his benefit regardless of whether he worked but one day of ninety or not. I think Mr. Eason is the general claim agent of the company. I had a conversation with him prior to the issuance of the $25 check on 21 June, 1929, with reference to seniority rights, and he approved the seniority rights down there; he stated that in Mr. Spears' presence. After that they paid me the check for $25.00." The policy and certificate were issued to plaintiff on 1 July, 1926, and were in force 28 March, 1929, at the time of the alleged injury and disability of plaintiff.

Certificate No. 26, issued 1 July, 1926, to Thomas M. Smith, material provisions applicable:

"Ætna Life Insurance Company
Accident and Liability Department
of Hartford, Connecticut.

Has insured by a Group Policy of Disability Insurance No. GS-2391 certain employees of the News and Observer Publishing Company. Under and subject to the terms and conditions of said policy Thomas M. Smith, an employee, when wholly and continuously disabled by sickness or accidental bodily injury and thereby prevented from engaging in any occupation or employment for wage or profit, will be paid indemnity at the rate of twenty-five dollars per week beginning with the first day of disability and continuing during disability except that benefits will not be paid for more than thirteen consecutive weeks. . . . *This insurance will cease upon failure on the part of the employee to pay the required premium contribution to the News and Observer Publishing Company, or upon termination of employment* except that the insurance of an employee shall not terminate while he is disabled and entitled to benefits hereunder; or upon the discontinuance of the Group Policy."

"Ætna Life Insurance Company
Accident and Liability Department
of Hartford, Connecticut.
(Herein called the Company.)

Hereby agrees, in receipt of due proof that any insured employee of News and Observer Publishing Company, of Raleigh, county of Wake, and State of North Carolina (herein called the employer) is wholly and continuously disabled by accidental bodily injury which does not arise out of and in the course of employment or by sickness, and is thereby prevented from engaging in any occupation or employment for wage or profit. To pay to such employee a weekly indemnity in the amount determined in accordance with the insurance schedule shown on the second page of this policy for the period of such disability beginning with the first day thereof, but not exceeding thirteen consecutive weeks. . . . *Insurance on any employee shall terminate as of the date he ceases to make the required premium contribution toward the cost of the insurance, leaves the service of the employer, is dismissed therefrom, is pensioned or otherwise discontinues working for said employer.* . . . The employer shall return to the Company the registration cards of those employees whose insurance has been terminated, within 31 days of the date of termination of such insurance." (In application for insurance): "What part of the premium is to be paid by the employees? All."

The insurance premiums have been paid to defendant company. Proof of claim has been made by plaintiff as required by defendant.

The plaintiff alleges: That, on 28 March, 1929, while plaintiff was in the employ of said News and Observer Publishing Company, and while the said insurance contract was in force and effect, the plaintiff received an accident, bodily injury, as a result of which the seventh vertebrae of his spinal column was broken, his left leg badly bruised and torn, and other skin abrasions, which injuries are permanent, as he is informed and believes. That, as a result of the aforesaid injuries the plaintiff, on 20 June, 1929, became wholly and continuously disabled and thereby prevented from engaging in any occupation or employment for wage or profit, and since said date, has been unable to perform any kind of work, either mental or physical. That, immediately after plaintiff's injuries became permanent and he thereby became wholly and continuously disabled, he gave the News and Observer Publishing Company notice of such disability, and has been ever since under the care of a physician. That, in compliance with his part of the contract of insurance the plaintiff furnished the defendant with a certificate of the attending physician, and did and performed each and every part of said contract of insurance encumbent upon him to do and perform. That, on 12 July, 1929, the defendant issued and delivered to the plaintiff its check or voucher in the sum of $25.00 in settlement of the plaintiff's indemnity, first accruing under the said contract of insurance. That thereafter, to wit, 27 August, 1929, the defendant issued its check or voucher in the sum of $125.00, payable to the order of the plaintiff, to cover five weeks indemnity, and as plaintiff is informed, believes and alleges, mailed said check or voucher to its agent in Raleigh, with instructions to deliver to the plaintiff, but which, for some reason unknown to the plaintiff, has never been delivered.

The prayer for judgment was for $300, amount of balance due under terms of the policy.

There was evidence on the part of plaintiff to sustain these allegations. There was some question as to whether plaintiff was "wholly and continuously disabled by sickness or accident bodily injury," etc., under the policy and the duration.

*J. S. Manning and Walter L. Spencer for plaintiff.*
*Murray Allen for defendant.*

CLARKSON, J. The defendant, at the close of the plaintiff's evidence and at the close of all the evidence, made motions for judgment as in case of nonsuit. C. S., 567. The court below granted defendant's motion at the close of all the evidence, and in this we think there was error.

The questions involved: (1) Was the plaintiff at the time of the alleged injury or disability, an employee of the News and Observer Publishing Company, under what is known as the *substitute rule,* and did the defendant issue the *group insurance* and through its agent or agents collect the insurance premiums from plaintiff with knowledge of the *substitute rule?* (2) Did the defendant or its agent or agents after the *group insurance* was issued collect the premiums from plaintiff and by its acts, conduct, transactions or declarations treat the policy as still in force with knowledge of the *substitute rule?*

It is not denied that plaintiff has paid the premiums required by defendant.

We think the whole question depends on the fact as to whether when defendant issued the "group insurance" it knew of the substitute rule, or with knowledge of the rule received premiums and by its acts, conduct, transactions or declarations treated the policy as still in force. The certificate says: "This insurance will cease *upon failure on the part of the employee to pay the required premium contribution to the News and Observer Publishing Company, or upon termination of employment,* except that the insurance of an employee shall not terminate while he is disabled and entitled to benefits hereunder; or upon the discontinuance of the group policy." The policy says: *"Insurance on any employee shall terminate as of the date he ceases to make the required premium contribution toward the cost of the insurance, leaves the service of the employer, is dismissed therefrom, is pensioned or otherwise discontinues working for said employer."*

As far as the employer, the News and Observer Publishing Company, is concerned, the evidence is plenary that it recognized the substitute rule, and under its terms considered plaintiff its employee. Further, plaintiff has never left the service of the employer or been dismissed, pensioned or otherwise discontinued working for said employer. It may be that this alone, under a liberal construction of the policy, is decisive under the language of the policy, but we do not so decide. *Poole v. Insurance Co.,* 188 N. C., at p. 469; *McCain v. Insurance Co.,* 190 N. C., at p. 551. There is evidence on the part of plaintiff that defendant, through its agent or agents knew of and recognized this substitute rule and issued the "group insurance" and took the premium from defendant with full knowledge, and after issuing the policy knew of the substitute rule, received the premiums on the policy and by its acts, conduct, transactions or declarations treated the policy as still in force.

In *Grabbs v. Insurance Co.,* 125 N. C., at p. 396, it is stated: "We think the rule is well settled that where an insurance company, life or fire, issues a policy with full knowledge of existing facts which by its terms would work a forfeiture of the policy, the insurer must be held

to have waived all such conditions, at least to the extent of its knowledge, actual or constructive. It cannot be permitted to knowingly issue a worthless policy upon a valuable consideration. An implied waiver is in the nature of an estoppel *in pais,* which might well be enforced by any court of equity under such circumstances." *Gerringer v. Ins. Co.,* 133 N. C., 407.

In *Bullard v. Ins. Co.,* 189 N. C., at p. 37, we find: "The 'iron-safe clause' in policies of insurance is generally upheld by the courts as a reasonable contract limitation upon the insurer's risk *(Coggins v. Ins. Co.,* 144 N. C., 7); but if the company, knowing the insured has not complied with this provision, collects the premiums and recognizes the validity and binding force and effect of the policy it has issued, it should not be heard to insist upon the introduction of records, the keeping of which it has thus tacitly waived. There is a distinction between waiver and estoppel; but the waiver of a forfeiture, though in the nature of an estoppel, may be created by acts, conduct, or declarations insufficient to create a technical estoppel. . . . (p. 38) Conditions which form a part of the contract of insurance at its inception may be waived by the agent of the insurer, although they are embraced in the policy when it is delivered; and the local agent's knowledge of such conditions is deemed to be the knowledge of his principal."

The principle is thus stated in *Midkiff v. Ins. Co.,* 197 N. C., at p. 143: "In the instant case, there was evidence tending to show that the local agents of the defendant company, at the time they countersigned and issued to the plaintiffs the policy of insurance, insuring their stock of merchandise, knew that plaintiffs had and kept dynamite and dynamite caps on the described premises, as part of said stock of merchandise, and that with this knowledge they issued the policy. There was no evidence tending to show that the dynamite and dynamite caps on said premises, kept by plaintiffs as part of said stock of merchandise, at the date of the fire, had been added to said stock of merchandise since the issuance of the policy. The knowledge of the local agents, in this instance, was the knowledge of the defendant. It must be held, therefore, that defendant having issued the policy, with knowledge of the presence of the dynamite and dynamite caps on the premises described in the policy, waived this condition, and is estopped to rely upon the presence of the dynamite and dynamite caps, on said premises, at the date of the fire, as releasing the defendant from liability under the policy."

In *Houch v. Ins. Co., ante,* at p. 305, it is written: "There was evidence tending to show that at the date of the issuance of the policy, defendant's agent was informed by the plaintiff, N. F. Houck, that he and M. V. Houck owned only an estate in the land for his life, and that

his children owned the remainder in fee. This knowledge is imputed to the defendant. This evidence was sufficient to show a waiver by defendant of the provisions of the policy on which it relies," citing authorities. *Clapp v. Ins. Co.*, 126 N. C., 388; *Strause v. Ins. Co.*, 128 N. C., 64; *Gerringer v. Ins. Co., supra; Cockfield v. Fireman's Ins. Co.*, 144 S. E., 71, 146 S. C., 351.

The cases above cited from the decisions of this Court are fully sustained by Mr. Cooley in his brief on Insurance, 2 ed., Vol. 5, p. 4204, *et seq.* Mr. Cooley further, at p. 4272, says: "If, therefore, an insurance company, with knowledge of facts vitiating a policy, enters into negotiations or transactions with the insured, by which the company recognizes or treats the policy as still in force, or by its acts, declarations, or dealings leads the insured to regard himself as protected by the policy, or induces him to incur trouble or expense, such acts, transactions, or declarations will operate as a waiver of the forfeiture, and estop the company from relying thereon as a defense to an action on the policy." And at p. 4290: "The weight of authority supports the proposition that an insurance company waives or is estopped to assert a violation of the terms of an insurance contract if the company, on being notified of the violation, remains silent and fails to object or to declare a forfeiture, or cancel or rescind the contract, within a reasonable time. This rule is no doubt in most cases based on the theory that it is a breach of good faith on the part of an insurance company to remain silent and inactive on notice of a breach, and to retain the unearned premiums, and so lead the insured to believe that his insurance contract is regarded as valid notwithstanding the breach." *Collins v. Farmville Ins. & Banking Co.*, 79 N. C., 279. See *Mutual Protective League v. Walker* (Ky.), 173 S. W. Rep., 804; *Citizens Nat. Life Ins. Co. v. Egner* (Ky.), 180 S. W. Rep., 778.

It is the settled rule of practice in this jurisdiction that, on a motion to nonsuit, the evidence which makes for the plaintiff's claim and which tends to support his cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, is to be taken and considered in its most favorable light for the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom.

We think the evidence of plaintiff was sufficient and should have been submitted to the jury.

Reversed.