This is an action brought by plaintiff against defendant on a $5,000 policy of insurance in defendant's company, payable to her as beneficiary on the life of her husband, M. Lomax Hill, issued 26 July, 1926. The policy No. 90479 was duly delivered by defendant upon which plaintiff is suing. The first annual premium of $167.65 was paid. The *Page 116 
allegations in the complaint, in part, are as follows: "That at the times mentioned in this complaint the said C. Y. Coley was a general agent and supervisor of the defendant within the State of North Carolina, and was in charge of its branch office in the city of Charlotte, N.C. That, as hereinbefore stated, prior to the maturity date of the note due 26 January, 1928, the defendant, acting through its duly authorized agent, Coley, expressly assured the plaintiff that the payment of said note would be extended until on or about 1 March, 1929, and assured the plaintiff that said policy of insurance would remain in full force and effect until such time; that the plaintiff, knowing that the said Coley was a duly authorized agent and representative of the defendant, relied absolutely upon the assurance thus given her to the effect that said policy of insurance was remaining in full force until the time indicated; that, by reason of the authority conferred upon the said Coley in and that, by reason of the prior acts and conduct of the said Coley in extending the time for the payment of premiums and premium notes and in receiving the payment thereof after due date, and that, by reason of the knowledge and acquiescence of the defendant in such conduct on the part of its agent and other agents, the plaintiff expressly alleges that the defendant waived the right to forfeit said policy by reason of the nonpayment of said note at the maturity date thereof."
These allegations were denied by defendant.
Plaintiff's evidence was to the effect that on 26 August, 1927, M. Lomax Hill paid to W. B. Brown, who was secretary and treasurer of the Gordon Insurance and Investment Company, agency managers Southeastern Division of defendant company, the sum of $50 cash, and that at the same time in order to secure an extension of time in which to pay the balance of the premium, which was due on the 26th of the preceding month, he executed and delivered to the said W. B. Brown two certain paper-writings, in one of which provided the policy should be in force on that date, he promised to pay to the Philadelphia Life Insurance Company the sum of $52.17 on 26 October, 1927; and in the other the sum of $52.17 on 26 January, 1928. The first of the two notes, the one due 26 October, 1927, was paid. The second note, the one due 26 January, 1928, was not paid at maturity. The assured died 24 February, 1928. The defendant claimed a forfeiture of the policy on account of the nonpayment of this second note.
Plaintiff's evidence was to the further effect: That one C. Y. Coley was not an ordinary local or soliciting agent of defendant company. He is referred to by one of the defendant's own witnesses as a general agent. Coley himself, as a witness for the defendant, testified: "I had charge of their branch office in Charlotte. I was manager of the Charlotte branch office. I had my name on the door. I had my name on the *Page 117 
stationery. . . . I had eight or nine agents under me in this Charlotte office. I handled the mail. I got the policies. . . . As to who had charge of the collection of renewal premiums in this territory, we were instructed to help all possible to collect renewal premiums after the first premium." It was in evidence that some of the high officials of defendant had been in Coley's office in Charlotte, N.C. and also had seen his letter heads. That on Coley's office in the city of Charlotte he used the title "Supervisor." That Coley was a supervisor of the defendant company and that he covered Charlotte, Gastonia and Concord. In this large territory, Coley automatically handled the collection of notes held by the defendant for premiums on its policies.
W. S. Pemberton, a witness for plaintiff, who spent three or four hours a day in Coley's office, and was intimately familiar with the routine, testified that Coley would extend the time for the payment of premium renewal notes, similar to the one in question. "I am swearing now that I have seen Mr. Coley extend time for the payment of premium notes. . . . I have seen Coley extend time. . . . I have seen Mr. Coley grant an extension of time for the payment of these extension notes, and have seen him accept payment of those extension notes after the maturity date thereof. After he collected the payment of the note after the maturity date he would mail the money to Monroe to Gordon Insurance and Investment Company."
S. B. Redwine, a witness for plaintiff, who was also in Coley's office, also testified to the same effect. He further stated that he had extended time on such notes himself acting under Coley's instructions. "These renewal premiums were not always paid in cash; part of it had to be paid in cash, but they would take a note for part of it. Mr. Coley had charge of that in this territory. I have seen Mr. Coley accept payment on these renewal notes after the maturity date of the notes. Mr. Coley did at times extend the time for the payment of these renewal notes. He has sent me out and gotten me to do that myself."
C.L. Coley himself stated that he was given a list of the notes in his territory some time prior to their maturity dates. "When the letter came about those premium notes I called on the maker of those notes. I tried to get them to pay them. I was authorized to collect them if I could and was urged to collect them if I could. I was urging the people to pay them." He admitted that frequently these note-makers could not pay promptly and would request a little indulgence, and then he said: "And sometimes when a person I knew was absolutely good would request a few days extension I would tell him he could have the extension without waiting to write in to the Gordon Company, because I knew they would give me an immediate reply when I sent it, and the practice was to extend them if desired. So when a person I knew was *Page 118 
good asked me for an extension, I would tell them yes, and then knowing I could immediately write to the company, and if the company did refuse it. I would go back and notify the man in time to pay."
Plaintiff testified, in part: "I later had a conversation with Mr. C. Y. Coley about the middle of January, 1928 (before the note was due 26 January), at the Selwyn Hotel news stand where I was then working for Mrs. Newton. Q. State what conversation you had with Mr. Coley at that time and place? A. About the middle of January, 1928, I saw Mr. Coley and asked him could I pay the premium note on Mr. Hill's insurance. He asked me if it was made out to me; if it was I could pay it. I told him I was looking for some money from Mr. Hill, and that I wanted to pay it, but could not pay it then, and wanted to know if he could hold it until the first of March; that if I did not have the money then I would pawn my ring. He says: `Yes, Mrs. Hill, I will hold it until the first of March.' Prior to that conversation which I had with Mr. Coley, he had not made any demand on me for the payment of the note. For some time prior to that conversation with Mr. Coley I had received my husband's mail and opened it. I had not seen any mail from the Philadelphia Life Insurance Company to my husband. That was the last conversation I had with Mr. Coley before my husband's death. He told me he would hold the premium note. That is the only time I ever talked to him about this."
Jackson Maloney, vice-president of the defendant company, a witness for defendant, testified, in part: "It was customary for general agents to have that authority. Coley would have had that authority as general agent, or supervisor, or manager, as all of these officers have that authority. If he had the authority he would have come under one of these titles."
The note in question was for the balance on premium period from 26 July, 1927, to 26 July, 1928. At the time of the plaintiff's request to Coley to give extension to 1 March, 1928, the defendant had already received a $50 cash payment and had received payment of the first note above referred to. Two-thirds of this premium had been paid, and that on a pro rata basis, the premium had been paid to 26 March, 1928. The plaintiff requested extension until 1 March, in which to pay the last note of M. Lomax Hill. He died 24 February, 1928. The witness Redwine testified that Coley would always extend the time for payment of one of these notes "to whatever time the insured wanted it extended, provided that did not go beyond the time that the amount of money he had paid on the premium would carry the insurance."
Frank G. Combes, the secretary and treasurer of the defendant company, seems to have followed this same plan in outlining the policy of the company as to taking notes for premiums. He testified: "By the *Page 119 
pro rata portion of the premium means that you take an annual premium and divide it by twelve, and that would be the pro rata premium for one month. Now, if the note was to run for three months, then the cash portion would be three-twelfths or one-quarter of an annual premium. That is one of the conditions that we outlined to the Gordon Company."
The note in controversy, by its terms, says: "It is understood and agreed to by me that if this note is not paid at its maturity, or to the expiration of any period to which it shall have been extended."
Prior to the death of Hill, there was no notice of the forfeiture. Combes testified: "Q. Yes, but sometimes under some circumstances when you forfeited the policy you would write the policyholder and tell him of the action on the part of the company, wouldn't you? A. We would not only do that, but we would write him and ask him if he would not like to reinstate the policy, and just sign a little application for reinstatement, and say he was in good health and had not been sick, and all that sort of thing, and we would be very glad to get that note paid with that application for reinstatement. Q. And did you have certain forms for doing that? A. Yes."
There was other evidence indicating that Coley was a general agent, manager or supervisor of defendant company, and there was other evidence indicating a custom and usage on the part of Coley of extending time for the payment of notes similar to the one in question, by taking cash or other notes, or by agreeing that the note should be paid subsequent to the date of maturity, and that this was done with the knowledge or approval of the defendant company.
The issues submitted to the jury and their answers thereto were as follows:
"1. Was the policy of insurance No. 90479 issued and delivered as alleged in the complaint? Answer: Yes.
2. Was the time of payment of the premium on said policy extended by C. Y. Coley as alleged in the complaint? Answer: Yes.
3. If so, was said C. Y. Coley acting within the scope of the agency in so doing, as alleged in the complaint? Answer: Yes.
4. What amount, if any, is plaintiff entitled to recover of defendant? Answer: $3,000."
The court below rendered judgment on the verdict. Defendant made numerous exceptions and assignments of error, and appealed to the Supreme Court. The material ones will be considered in the opinion. The other necessary facts will be set forth in the opinion.
The defendant, at the close of plaintiff's evidence, and at the close of all the evidence, made motions in the court below for judgment as in case of nonsuit, C. S., 567, which the court overruled. In this we can see no error.
"It is the well settled rule of practice and accepted position in this jurisdiction that, on a motion to nonsuit, the evidence which makes for the plaintiff's claim and which tends to support her cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its most favorable light for the plaintiff, and she is `entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.'" Nash v.Royster, 189 N.C. at p. 410.
In Hill v. Philadelphia Life Ins. Co., 35 Fed Rep., 2d Series, when this action was before the Circuit Court of Appeals (4th Circuit), Soper,District Judge, for the Court, said at p. 135-6: "We are impressed with the weight of these considerations, and it may be that they would prevail if supported by evidence on behalf of the company demonstrating that in fact the company had not authorized or acquiesced in the exercise of the power by its agent. But a verdict was directed for the defendant at the conclusion of the plaintiff's case, and it seems to us that in the present state of the record the argument goes to the weight rather than to the sufficiency of the evidence, and that the case should have been submitted to the jury to determine whether authority to waive the provisions of the policy had actually been conferred. It is clear that policyholders were frequently permitted to make part settlement of premiums due by giving their promissory notes. This was done in the case at bar when the cashier accepted the notes of the insured in part payment of the second premium. The recitals and agreements annexed to these notes, which have been set out above, indicate that the document was executed upon a form prepared by the company for such contingencies. In addition to these established facts, there is a direct testimony of Pemberton that notes were customarily used by policyholders in part payment of premiums subsequent to the first. It would seem that such notes were accepted by Coley as a matter of course in payment of premiums, were sent by him in the regular course of business to the manager of the Southeastern department of the company at Monroe, and were returned to Coley for collection fifteen days before their maturity. Coley's practice in making collections upon these notes is also significant. He collected cash whenever he was able, but ofttimes accepted renewal notes in place of cash or extended the time for payment of the notes for a few days. It does not appear that, when he exercised the discretion to grant indulgence, he had received prior authority from any superior officer in the company's employ. We *Page 121 
think it may be fairly inferred from these circumstances, as the record now stands, that the company was cognizant of its agent's acts, that it was aware that he was extending the time for the payment of premiums without the authority of a superior officer, and that it acquiesced in his course of dealing." Numerous authorities are cited in support of the above decision.
In Gazzam v. Ins. Co., 155 N.C. at p. 337 (quoting from Quinlan v.Ins. Co., 133 N.Y. 365), we find: "Now, as heretofore, it is competent for the parties to a contract of insurance, by agreement in writing or by parol, to modify the contract after the policy has been issued, or to waive conditions or forfeitures. The power of agents, as expressed in the policy, may be enlarged by usage of the company, its course of business, or by its consent, express or implied. The principle that courts lean against forfeitures is unimpaired, and in weighing evidence tending to show a waiver of conditions or forfeitures the court may take into consideration the nature of the particular condition in question, whether a condition precedent to any liability, or one relating to the remedy merely, after a loss has been incurred. But where the restrictions upon an agent's authority appear in the policy, and there is no evidence tending to show that his powers have been enlarged, there seems to be no good reason why the authority expressed should not be regarded as the measure of his power; nor is there any reason why courts should refuse to enforce forfeitures plainly incurred, which have not been expressly or impliedly waived by the company. . . . . (p. 338). It is also generally held that stipulations contained in the policy, upon which it shall have its inception and become operative as a contract, may be waived. The Court says, in Wood v. Ins.Co., 149 N.Y. 385, that this doctrine `has long been settled.'" Bullardv. Ins. Co., 189 N.C. 34; Houck v. Ins. Co., 198 N.C. 303; Smith v.Ins. Co., 198 N.C. 578.
In Murphy v. Ins. Co., 167 N.C. at p. 336, it is written: "It is also held by well considered cases on the subject here and elsewhere that this provision as to forfeiture, being inserted for the benefit of the company, may be waived by it, and such a waiver will be considered established and a forfeiture prevented whenever it is shown, as indicated, that there has been a valid agreement to postpone payment or that the company has so far recognized an agreement to that effect or otherwise acted in reference to the matter as to induce the policyholder, in the exercise of reasonable business prudence, to believe that prompt payment is not expected and that the forfeiture on that account will not be insisted on. Gwaltney v. Assur.Society, 132 N.C. 925; McCraw v. Ins. Co., 78 N.C. 149; Ins. Co. v.Eggleston, 96 U.S. 572; Ins. Co. v. Custer, 128 Ind. 25; Homer v. Ins.Co., 67 N.Y. 478; Vance on Insurance, p. 222." *Page 122 
The principle in the above case is cited and approved in Paul v. Ins.Co., 183 N.C. 159, and at p. 162, it is said: "'A course of action on the part of the insurance company which leads the party insured honestly to believe that by conforming thereto a forfeiture of his policy will not be incurred, followed by due conformity, on this part, will estop the company from insisting upon the forfeiture, though it might be claimed under the express letter of the contract.' Coile v. Com. Travelers, 161 N.C. 104;Ins. Co. v. Eggleston, 26 U.S. 577; Ins. Co. v. Norton, 96 U.S. 234."Arrington v. Ins. Co., 193 N.C. 344; Trust Co. v. Ins. Co., 199 N.C. 465.
In the present case Hill (the insured) died before the extended time expired, yet no notice was given of forfeiture by the defendant, and proofs of death were duly filed with defendant company.
In Cooley's Briefs on Insurance (2d ed.), Vol. 5, at p. 3969-3970, is the following: "The authority of agents of life insurance companies, so far as the public with whom they deal is concerned, is controlled not so much by the terms of their employment or by the terms of the policies, which they procure, as by the things which the principal permits them to do by the nature and extent of the business for which they are employed and permitted to carry on (McDonald v. Equitable Life Assur. Soc.,185 Iowa 1008, 169 N.W. 352). Powers possessed by agents of insurance companies are to be interpreted in accordance with the general law of agency. Fisk v. Liverpool London Globe Ins. Co., 198 Mich. 270,164 N.W. 522. In Alexander v. Continental Ins. Co., 67 Wis. 422,30 N.W. 727, 58 Am. Rep., 869, it is said that this rule is absolutely necessary for the protection of the insured. He deals with no one but the agent, and the company cannot deal with its patrons in any other way. Justice and law therefore require that the company shall be held to sanction what the agent agrees to, and on which the insured relies. But where the authority of an agent does not extend to making a new contract of insurance, he cannot waive a forfeiture; and the act of such agent is not binding on insurer unless it knew, or could have known, what was done, and adopted or ratified the act, or by its act or conduct estopped itself to insist on the forfeiture(Crook v. N.Y. Life Ins. Co., 75 A. 388, 112 Md. 268)." Bank v.Sklut, 198 N.C. 589.
We think under the law, as above set forth, and the facts and circumstances of this case, that there was evidence sufficient to be submitted to the jury that C. Y. Coley was acting within the scope of the agency when he extended the time of payment of the note given for the premium.
The next contention of defendant is practically a plea of res judicata, or plea in bar. We do not think this plea can be sustained. *Page 123 
This is the fourth time this action has been heard: (1) The suit was brought in the Superior Court of Mecklenburg County, N.C. by plaintiff and against the defendant and C. Y. Coley for $5,000, alleged to be due her as beneficiary under the policy, and was removed to the U.S. District Court for the Western District of North Carolina, on petition of defendant. At the first trial in the Federal Court a nonsuit was taken as to C. Y. Coley, and the jury failed to agree on the issues submitted, and a mistrial was ordered. (2) At the second trial in the District Court, judgment of nonsuit was entered against plaintiff and she appealed to the Circuit Court of Appeals. The cause was sent back for a new trial, the opinion by Soper,J., has been quoted in part above. (3) At the third trial, in the District Court, the plaintiff took a voluntary nonsuit. (4) This action was instituted 3 February, 1930, for $3,000, instead of $5,000, the court having jurisdiction of that amount — the defendant being a foreign corporation.
"A plaintiff may bring an action and have it heard upon its merits and, if a judgment of nonsuit is entered, he may bring a new suit within one year or he may have the cause reviewed by the Supreme Court. If the Supreme Court affirms the judgment of the trial court he may, under C. S., 415, bring a new action within the period therein specified. But, if, upon the trial of the new action upon its merits, in either event, it appears to the trial court and is found by such court as a fact, that the second suit is based upon substantially identical evidence, and that the merits of the second cause are identically the same, thereupon the trial court should hold that the judgment in the first action was a bar or res judicata and thus end that particular litigation." Hampton v. Spinning Co.,198 N.C. 240. McIntosh N.C. Practice Procedure, sec. 627.
The present action we do not think is based upon "substantially identical allegations and substantially identical evidence." Therefore, it does not come within the Hampton case, supra. Midkiff v. Ins. Co.,198 N.C. 568. It is unnecessary to set forth the facts showing the difference, nor was it necessary for the court below as a matter of law to do so — it was discretionary.
The conduct of defendant in not paying this claim does not appeal to a court of justice. Plaintiff requested C. Y. Coley (admitted by defendant to be its agent, but denying the authority of its agent to extend the note in controversy) to hold the note until the first of March. "That if I did not have the money then I would pawn my ring. He says, `Yes, Mrs. Hill, I will hold it until the first of March'" (1928). Her husband, M. Lomax Hill, was killed on 24 February, 1928. The actual amount paid on the premium on a pro rata basis would have carried the policy until 26 March, 1928. The premium in controversy was for the *Page 124 
period from 26 July, 1927, to 26 July, 1928. Of this, $50 cash had been paid and two notes given for balance of premium. The first note for $52.17 had been paid, which was due 26 October, 1927, and the second note for $52.17, which this controversy is over, was due 26 January, 1928. Defendant would forfeit this $5,000 policy, now claimed by the widow, on a technical ground, having money in its possession paid by her husband that on a pro rata equitable basis the insurance would not have expired until 26 March, 1928. Plaintiff's husband was killed over a month prior to that time. Like Portia, the witness Pemberton, who sold the policy in defendant company to the dead man, and for justice to his widow, the beneficiary in the policy, has stepped in and from his testimony and others the jury has under the law saved the forfeiture, which is "not favored either in equity or in the law." In the trial in the court below, we can find no error, the jury has found the facts in plaintiff's favor.
No error.