**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

HIGH COUNTRY ARTS AND CRAFT
GUILD,
<u>Plaintiff-Appellee,</u>

No. 96-2670

v.

HARTFORD FIRE INSURANCE COMPANY,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(CA-95-233-1-T)

Argued: June 5, 1997

Decided: October 17, 1997

Before WIDENER and NIEMEYER, Circuit Judges, and
MICHAEL, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Widener and Senior Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Donald Lee Craig, BUTLER, BURNETTE & PAPPAS,
Tampa, Florida, for Appellant. Edward Glenn Kelly, James Gary
Rowe, KELLY & ROWE, P.A., Asheville, North Carolina, for Appel-
lee. **ON BRIEF:** Gary S. Parsons, John M. Kirby, BAILEY &

DIXON, L.L.P., Raleigh, North Carolina; George W. Hendon, Martin K. Reidinger, ADAMS, HENDON, CARSON, CROW & SAENGER, P.A., Asheville, North Carolina, for Appellant.

_____

**OPINION**

NIEMEYER, Circuit Judge:

The jury returned a verdict against Hartford Fire Insurance Company, finding that it breached its policy of insurance in refusing to pay the fire loss claims of its insured, High Country Arts and Craft Guild, and that it did so in bad faith. Hartford now challenges certain post-trial rulings of the district court. Rejecting these challenges, we affirm.

I

High Country Arts and Craft Guild, a nonprofit corporation located in Asheville, North Carolina, was engaged in promoting and sponsoring arts and craft events "with the idea of helping artists and craftsmen make a living at the work they like to do." On April 2, 1995, a fire destroyed High Country's office and all of its property, including its computer database containing fund-raising and donor information. While High Country reopened an office about one month later at a new location, it struggled due to the lack of the database and diminished receipt of donations, and it wished not to proceed with shows scheduled for the summer.

At the time of the fire, High Country was insured by Hartford Fire Insurance Company for, among other things, loss of personal property and loss of business income. Hartford paid the policy limits of $5,400 for the loss of personal property and, because the loss of business income was expected to be substantial, appointed the Asheville adjusting firm of Central Claims Service to handle the business income claim. Central Claims Service appointed Steven Peek as the claims adjuster.

In June 1995, Peek met with High Country employees and advised them that High Country had 12 months of coverage for business inter-

2

ruption loss and that High Country had a duty under the policy to mitigate its damages during that period. He stated that High Country was therefore required, contrary to its wishes, to put on the shows that had been scheduled. When High Country advised Peek that it was unable to do so professionally, Peek insisted on Hartford's position that High Country was required to put on the shows. He explained that by going ahead with the shows, Hartford could measure High Country's business loss for the year. Peek's insistence on proceeding with the shows was approved by Hartford's home office. Despite High Country's continuing protests to Hartford and its expectation of losses, High Country put on two shows scheduled in July and early August 1995, losing over $61,000 on one and approximately $13,000 on the other.

Because of disagreements about the amount of loss, the parties submitted that issue to a panel of appraisers, in accordance with policy provisions, who assessed High Country's business loss for the first 60 days after the fire at $26,518. The appraisers did not quantify the loss sustained after 60 days because they concluded that"[t]he period of coverage under the business interruption provisions of the policy in question should be limited to sixty days." They concluded that the losses from the two shows occurred after the 60-day period and therefore should not be covered, adding that no loss caused by a "lack of operational funds should be attributable to the policy." Hartford tendered $26,518 to resolve the claim, but High Country insisted on payment for losses sustained during the 12 months after the fire.

High Country filed suit in state court, alleging claims for breach of contract, tort, and state statutory violations, and Hartford removed the case to federal court on the basis of diversity jurisdiction conferred by 28 U.S.C. § 1332. Following trial, the jury returned a verdict in favor of High Country, finding that Hartford breached its contract of insurance; that Hartford required High Country to put on shows to mitigate its losses; that the policy provided High Country with insurance against business income loss for 12 months; and that Hartford acted in bad faith in refusing to settle with High Country. The jury awarded High Country $246,809 in compensatory damages and $148,085.42 in punitive damages. In lieu of punitive damages, however, High Country elected an award of treble damages and attorneys fees under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-16 & 75-16.1.

3

On appeal, Hartford assigns three errors. It argues that (1) the district court erred in refusing to set aside the judgment because Peek was without authority to extend coverage from 60 days to 12 months; (2) the district court should have limited the damages for High Country's business income loss to the $26,518 fixed by appraisers; and (3) the district court erred in allowing a verdict under North Carolina's Unfair and Deceptive Trade Practices Act to stand in conflict with an earlier summary judgment ruling made by the court in favor of Hartford.

II

Hartford's principal argument is directed at the trial court's refusal to grant Hartford's posttrial motion for a judgment as a matter of law because "the court [erroneously] held Hartford Fire liable for 12 months loss of business income despite the language of the policy, relying on what Peek, the independent claims adjuster, represented to High Country." While the jury, not the court, found business loss for the 12-month period, apparently Hartford claims that somehow the jury relied on Peek's representation to High Country rather than on the policy language. Hartford explains:

> The jury found that Hartford Fire breached the policy by not paying more than $240,000 for twelve months of loss of business income. This _apparently_ was based upon findings that Mr. Peek, acting as Hartford Fire's agent, told High Country that it was entitled to loss of business income coverage for the entire twelve months following the date of the fire and that it must put on events which were likely to lose money. The Court, in ruling on Hartford Fire's Post-Trial Motion for Judgment as a Matter of Law, rejected Hartford Fire's argument that Mr. Peek had varied the terms of the policy beyond his authority to do so. The Court's ruling is error. As a matter of law, Mr. Peek had no authority, apparent or otherwise, to modify the plain language of the policy. Therefore the Court should have granted Hartford Fire's Motion for Judgment as a Matter of Law.

(Emphasis added).

4

While the jury found as a fact that Peek represented to High Country that it was entitled to 12 months of coverage for loss of business income, there is no evidence that the jury based its award on Peek's representation and not on the policy's language. Because, however, we believe that Peek accurately stated, albeit in a general way, the scope of the policy's coverage, it is of no consequence whether or not he was authorized to make such a statement about the policy's coverage.

The policy reads in connection with business income loss coverage:

> We will pay for the actual loss of Business Income you sustain <u>due to</u> necessary suspension of your"operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at the described premises. . . .
>
> We will only pay for loss of Business Income <u>that occurs within 12 consecutive months after the date of direct physical loss</u> or damage. This Optional Coverage is not subject to the Limits of Insurance.

(Emphasis added). The policy defines the "period of restoration" as "the period of time that (a) [b]egins with the date of direct physical loss or damage . . . and (b) [e]nds on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality." The parties agree that the period of restoration constituted the first 60 days after the fire. Thus, in the context of this loss, the unambiguous language of the policy promises reimbursement for business income loss that was "due to," i.e., <u>caused by</u>, High Country's 60-day suspension of business and that <u>occurred</u> during the 12-month period following the fire. So long as a business loss is causally linked to the 60-day period, it is covered even if it occurs after that period, provided that it "occurs" within 12 months after the date of loss.

The coverage under the policy for loss of business income attributable to suspended operations is distinct from coverage for loss of business income due to damage or loss of electronic records. That

5

coverage is limited to "the longer of (a) 60 consecutive days from the date of direct physical loss or damage; or (b) the period beginning with the date of direct physical loss or damage, necessary to repair, rebuild, or replace [the records]."

Thus, when Peek told High Country that it had 12 months of coverage for loss of business income, his statement was accurate. What was not said was that the loss of business income had to be due to the suspension of business during the 60-day period of restoration, and could not be attributed to loss of electronic records after the 60-day period. But the failure to explain all of the limitations or conditions of the 12-month business loss coverage does not render Peek's statement a misrepresentation that somehow altered the coverage of the policy.

Internal Hartford correspondence reveals an understanding that is not inconsistent with Peek's statement to High Country. As of June 5, 1995, an internal Hartford record reveals that High Country was already claiming between $50,000 and $100,000 and that the claim could go higher with the loss of income from the cancellation of shows, which everyone then knew were scheduled for dates substantially beyond the initial 60-day period. An internal Hartford memo dated July 21, 1995, states further, "Future handling: Central Claims is handling the business interruption loss. The policy states there is coverage for twelve months or until the business is fully operational." Hartford recognized at that time that High Country's loss of all business property and organizational information severely impaired its ability to put on shows in a professional manner. Yet, Hartford elected to mandate that the shows scheduled after the 60-day period not be canceled in order to require High Country to mitigate damages. It could not have made such a demand if it believed that the policy only covered the first 60-days of business income loss.

We agree with Hartford that whether or not Peek was an agent, he could not alter the insurance policy's coverage through his simple oral explanations of coverage to the insureds. The policy explicitly provides that it encompasses "all agreements" between Hartford and the insured and that changes are accomplished only through "endorsement[s] issued by [Hartford]." While policy limitations are not the sole constraint on the agent's authority, see Thomas v. Prudential Ins. Co., 104 F.2d 480, 482 (4th Cir. 1939); Hill v. Philadelphia Life Ins.

6

Co., 156 S.E. 518, 522 (N.C. 1931); Capitol Funds, Inc. v. Royal Indem. Co., 458 S.E.2d 741, 744 (N.C. App. 1995), it is well-settled that an agent with limited apparent powers, such as Peek, lacks the authority to alter a policy's terms and conditions absent the application of compelling equitable principles to the contrary. See, e.g., Pearce v. American Defender Life Ins. Co., 343 S.E.2d 174, 177 (N.C. 1986); Foscue v. Greensboro Mut. Life Ins. Co., 144 S.E. 689, 690 (N.C. 1928); Bynum v. North Carolina Blue Cross & Blue Shield, Inc., 222 S.E.2d 263, 266 (N.C. App. 1976); see also Northern Assurance Co. v. Grand View Bldg. Ass'n, 183 U.S. 308, 321 (1902)(noting the general rule that "a condition contained in the [insurance] policy cannot be waived by an agent, unless he has express authority so to do"). But recognition of this principle does not advance Hartford's argument. It still is responsible to pay High Country in accordance with the written promises contained in the policy and those promises include a promise to pay for the actual loss of business income that occurs "within 12 consecutive months after the date of direct physical loss or damage" which is "due to necessary suspension of your `operations' during the `period of restoration'." In other words, Hartford is responsible for losses caused by the close of High Country's business during a 60-day period, whether or not those losses showed up during the 60-day period, so long as they occurred within 12 months.

III

Hartford also contends that the appraisal of loss at $26,518 should, as a matter of law, govern to the same extent as would an arbitration award.

The policy provides with respect to appraisals:

> If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire.[I]f they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss.

7

(Emphasis added). We agree with Hartford that for purposes of determining the <u>amount</u> of a loss, the policy provision governs and is contractually binding on the parties.

Appraisal provisions which bind the parties on "the single issue of the amount of loss under a fire insurance policy, reserving all other issues for trial in court" long ago withstood due process challenges. Hardware Dealers Mut. Fire Ins. Co. v. Glidden Co., 284 U.S. 151, 159 (1931); see also Bentley v. North Carolina Ins. Guar. Ass'n, 418 S.E.2d 705, 709 (N.C. App. 1992). And, in the absence of "evidence of fraud, mistake, duress or other impeaching circumstance," North Carolina clearly considers the parties contractually bound by the results of appraisals. Young v. New York Underwriters Ins. Co., 176 S.E. 271, 273 (N.C. 1934); see also McMillan v. State Farm Fire & Cas. Co., 379 S.E.2d 88, 90 (N.C. App. 1989) (upholding the results of a fire insurance appraisal process "for determining the amount of loss").

High Country argues, however, that this clause is illusory because Hartford retained the right to back out, directing our attention to language of the policy which reads: "If there is an appraisal, we [Hartford] will still retain our right to deny the claim." We disagree with High Country's interpretation that this clause makes the appraisal provision illusory. That clause does not release Hartford from the binding effect of an appraisal as to the amount of loss-- Hartford would be bound to the same extent as would be High Country. Rather, the clause reserved to Hartford the right to deny the claim for any just reason. The clause eliminates the possible construction that simply because Hartford requests or submits to an appraisal, it would therefore be bound to pay a claim. On a vigorously contested coverage question, Hartford might well choose to seek an appraisal to determine the amount of a loss with the idea of paying it as an economic matter rather than litigating a coverage issue. By force of the same reasoning, however, it could request the appraisal and, when it found the amount excessive, deny the claim on coverage grounds. By denying the claim, however, Hartford could not deny the appraised amount of the loss if it were later determined that it was wrong on the coverage issue. That amount would have been established by the appraisal.

Our reading of this clause does not, however, entitle Hartford to limit the damages in this case to $26,518, the amount of loss found

8

by the appraisers. Hartford would be entitled to that limitation only with respect to the loss for the first 60-day period after the fire because that is all that the appraisal purported to measure. If the appraisal had determined the loss for the 12-month period following the fire, which was attributed to the 60-day business interruption, then both parties would have been bound by the amount so determined.

We recognize that the appraisal in this case purported also to resolve the coverage period questions, finding that the policy provided only for 60-days coverage. But the policy conferred on appraisers only the right to determine "the _amount_ of loss," and consequently the parties are not to be bound by the appraiser's determinations of coverage issues.

IV

Finally, Hartford argues that the court's reliance on the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-16 & 75-16.1, to award treble damages and attorneys fees was precluded by the court's earlier summary judgment order in favor of Hartford. We reject the argument for several reasons.

Counts II and IV of the complaint in this case assert a right to treble damages and attorneys fees based on both the North Carolina Unfair Claims Settlement Practices Act, N.C. Gen. Stat. § 58-63-15(11), and the North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. § 75-16.1. In addressing before trial Hartford's motion for summary judgment, the district court ruled that High Country was not entitled to maintain a claim for "unfair claims practices" because High Country failed to show a "pattern or practice" of unfair claim settlements. The court ruled:

> [O]ne cause of action is appropriate for summary judgment. Plaintiff alleged a cause of action for unfair claims practices. Defendant moved for summary judgment on the grounds that Plaintiff had failed to show a pattern or practice of unfair claims. Plaintiff did not address this issue in its opposition to the motion for summary judgment and thus, judgment dismissing this cause of action is appropriate.

9

Neither the court nor the parties thereafter interpreted this ruling to preclude the prosecution of claims for unfair trade practices under N.C. Gen. Stat. § 75-1.1. While proof of unfair claims practices does constitute per se proof of an unfair or deceptive trade practice under N.C. Gen. Stat. § 75-1.1, see, e.g., Pearce, 343 S.E.2d at 179; Murray v. Nationwide Mut. Ins. Co., 472 S.E.2d 358, 363 (N.C. App. 1996), failure to prove unfair claims practices does not independently necessitate judgment as a matter of law against a related claim for unfair trade practices.

Indeed, the court and all the parties involved continued to try the unfair trade practices issues to the jury. Both Hartford and High Country submitted to the court proposed jury instructions that included instructions on the claims for unfair trade practices. Similarly, during the discussion between the court and the parties about the appropriate jury charge, counsel for Hartford acknowledged the submission of the unfair trade practices claims to the jury, arguing for his own form of special interrogatories and instructions. Finally, the court instructed the jury on acts that would constitute unfair trade practices without objection to their inclusion from any party. Indeed, Hartford did not object on this ground even after the jury returned its verdict, advancing the point for the first time on appeal.

Finally, even if the court had in fact issued an order earlier in the case precluding or disposing of the claims for unfair trade practices, it was interlocutory so that the court clearly had the power to change its mind before final judgment. See, e.g., Hardin v. Hayes, 52 F.3d 934, 938 (11th Cir. 1995) (stating that court has plenary power over interlocutory orders); Wagoner v. Wagoner, 938 F.2d 1120, 1122 n.1 (10th Cir. 1991) (noting that district court has "general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment"); see also Fed. R. Civ. P. 54(b). In this case, however, it does not appear that the court changed its mind. Rather the court's earlier ruling was understood by all involved to be a limited order that still permitted a trial of statutory claims for unfair trade practices under N.C. Gen. Stat. § 75-1.1.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

10