S. K. YOUNG, T. R. YOUNG, AND W. H. HIPPS, TRUSTEE, v. NEW YORK UNDERWRITERS INSURANCE COMPANY.

(Filed 10 October, 1934.)

**1. Insurance L d—**

An award of fire loss made in accordance with the terms of the policy providing for arbitration is presumed valid and must stand, in the absence of fraud, mistake, duress, or other impeaching circumstances.

**2. Same—Definition of "an interested appraiser."**

"An interested appraiser," who is not qualified to act under an arbitration clause in a policy of fire insurance, is one who is partial, unfair, arbitrary and dominated by bias and prejudice for or against the parties or the property in question, or both, or who has some pecuniary interest in the result of the performance of the duties of appraiser.

**3. Same—Evidence that insurer's appraiser had previously acted as appraiser for insurance companies is insufficient to show interest.**

Evidence that an appraiser appointed by insurer under an arbitration agreement in a policy of fire insurance had previously acted as appraiser for insurance companies and individuals, and that insured protested his appointment on this ground, but later agreed and consented to his appointment, without evidence that the appraiser had any pecuniary interest in the result of the appraisal or evidence of any other disqualifying circumstance *is held* insufficient to be submitted to the jury on the question of whether insurer's appraiser was "an interested appraiser."

**4. Same—Evidence held insufficient to show interest on part of third appraiser or undue influence on him by insurer's appraiser.**

The appraiser for insured and the appraiser for insurer appointed a third person to settle items of difference between them in estimating a fire loss in accordance with the terms of the arbitration agreement of the policy. The only matter in difference between the appraisers was whether the part of the house remaining after the fire was of any value. Insured, in an action attacking the validity of the award made by the appraisers, introduced evidence that the third appraiser, before his appointment, told insured's appraiser that he considered the property a total loss, and that thereafter, after further investigation, he changed his mind and agreed with insurer's appraiser, and that in reaching his decision he used the figures made out by insurer's appraiser, which were practically identical with the figures made out by insured's appraiser, except for the item as to the value of the house remaining standing, *is held* insufficient to constitute any evidence of either fraud or vitiating interest on the part of such third appraiser, or that he was fraudulently influenced in signing the award by insurer's appraiser.

SCHENCK, J., took no part in the consideration or decision of this case.

CIVIL ACTION, before *Schenck, J.,* at April Term, 1934, of BUNCOMBE.

The plaintiffs owned a dwelling about three miles from the city of Asheville, and on or about 7 December, 1930, the defendant executed and

delivered a policy of fire insurance insuring said dwelling against loss by fire in the sum of $9,500 on the building, but permitted concurrent insurance thereon in the amount of $13,500. The plaintiff Hipps is trustee in a certain deed of trust covering the property. On 30 April, 1933, the house was burned. The policy provided that "in case insured in this company shall fail to agree as to the amount of loss or damage each shall, on the written demand of either, select a competent and disinterested appraiser. The appraiser shall first select a competent and disinterested umpire. . . . The appraisers shall then appraise the loss and damage, stating separately sound value and loss or damage to each item; and, failing to agree, shall submit their differences only to the umpire. An award in writing, so itemized, of any two when filed with this company shall determine the amount of sound value and loss or damage," etc. On 21 June, 1933,· the attorney for the plaintiffs wrote a letter to the adjuster of defendant, as follows: "In compliance with your request for an appraisal of the damage done by fire to the property of S. K. and T. R. Young, located at Emma, N. C., and covered by Policy No. 6130, I wish to advise you that the appraiser selected by us is O. V. Himes, living in Asheville, N. C.

"Your selection of Dion A. Roberts as the appraiser of the insurance company will not be acceptable to us, for that the policy provides that it should be a disinterested appraiser, and we do not think him disinterested in as much as he has frequently been selected by you as appraiser for various losses of different insurance companies that you represent, and for which he received compensation from such insurance companies for such work." Thereafter, on 8 July, 1933, the plaintiffs and the defendant entered into a written agreement "for submission to appraisers." This agreement provided "that O. V. Himes and Dion A. Roberts shall appraise and ascertain the sound value of and the loss upon the property damaged and destroyed by the fire of 30 April, 1933. . . . Provided, that the said appraisers shall first select a competent and disinterested umpire, who shall act with them in matters of difference only. The award of any two of them made in writing, in accordance with this agreement, shall be binding upon both parties to this agreement as to the amount of such loss." On 25 July, 1933, Himes and Roberts duly took and subscribed an oath before a proper officer "that we will act with strict impartiality in making an appraisal and estimate of sound value and the loss and damage upon the property hereinbefore mentioned." On the same day Himes and Roberts duly appointed P. L. Harwood to act as umpire, to settle matters of difference that existed between them. On the same day Harwood, the umpire, duly took and subscribed an oath "that I will act with strict impartiality in all matters of difference only that shall be submitted to me in con-

nection with this appointment." Thereafter, on 29 July, 1933, Himes, Roberts and Harwood signed an award as follows: "We have carefully examined the premises and remains of the property hereinbefore specified, in accordance with the foregoing appointment, and have determined the sound value and the loss and damage to be as follows: Sound value, $9,275; loss, $5,695.56." The policy of insurance contained the ordinary three-fourths value clause.

Thereafter, on 29 August, 1933, the plaintiffs brought a suit against the defendant to recover the face amount of the policy, to wit, $9,500, alleging that the fire resulted in a total loss. The defendant filed an answer setting up the submission and the award of the arbitrators. The plaintiffs filed a reply alleging that the submission and award were invalid for the reason that Roberts, the appraiser selected by the defendant, and Harwood, the umpire, were not disinterested appraisers, and that said award was procured by means of fraud. The defendant countered to this pleading by denying that either Harwood or Roberts were disqualified to act as arbitrators, and that even if Roberts was disqualified, the plaintiffs were fully appraised and informed as to such disqualification prior to executing the agreement "for submission."

Himes, the chief witness for plaintiffs, testified that after he was notified of the appointment of Roberts that they got together and talked over the matter and they could not agree on the amount of damage to the dwelling. Himes suggested the appointment of Harwood as umpire. Prior to his appointment as appraiser Himes had taken Harwood, the umpire, to the scene of the fire and requested his opinion as to the amount of loss, and Himes testified at the trial that Harwood had told him "he considered it a total loss." S. K. Young, one of the plaintiffs, testified that his son had employed Roberts "after the fire to make an estimate of the cost to rebuild. This was about two months before the arbitration, and Roberts made a figure and agreed to do the repair work for $5,700 and something, and that when Roberts gave him that figure and agreed to do the work for that that he refused to have it done."

Bearing upon the question of bias and interest of Roberts, Himes testified that Roberts contended that a good per cent of the house could be left standing as it was, and Roberts submitted this "chief difference to the umpire, Mr. Harwood; that Harwood asked what was the difference between them, and they talked over the differences, and Mr. Roberts told Harwood what he thought was their difference; that it was the remainder of the house that was standing at that time and that their other figures were almost exactly the same." Harwood requested a day or two in which to make his decision. Himes suggested that Harwood take no figures made by either himself or Roberts, "but that he go on the ground and make his own figures." Roberts suggested "that Harwood

take the figures or that he could do as he pleased, or . . . as he could have his figures if he wanted them." Harwood took Roberts' figures rather than those made by Himes. When Harwood was ready to make his decision he said: "Well, I am just taking Mr. Roberts' figures, adding for some trim in the two front rooms. . . . I am just going to let Roberts figure that trim, and he took Mr. Roberts' figures to show the value of the trim, and that when Roberts figured the trim and put it down, they signed the agreement." Himes said: "Well, gentlemen, I am not signing this," and Mr. Roberts said, "You had just as well sign it, because it will go in this way," and I said, "I reckon it will, because you signed it, and I guess I might just as well sign it as two of you have agreed to it, but it is not my estimate at all on the damage." Himes further testified that he and Roberts and Harwood had all agreed that the sound value of the property was $9,275, as shown by the award. He further testified that he had suggested Harwood as umpire because "Harwood had been a contractor and he had known him some time; that he had a high regard for his opinion; that he knew his character and reputation; that he was a man of high character." He further said: "That so far as he and Mr. Roberts went their figures were almost the same, and that when Mr. Harwood took Roberts' figures away from the conference he was taking figures that Roberts and himself had very closely agreed upon."

With respect to the bias of Roberts, Himes testified "that Roberts told him that he had represented some insurance companies in adjusting, and that he expected Roberts told him that he had represented individuals against insurance companies; that Roberts had acted as adjuster both for and against insurance companies in appraisals. . . . That the only thing he saw wrong about Harwood was that he just seemed to want to take Roberts' figures altogether; that he did not consider anything else, and did not do any figuring; that Roberts figured the lower story was of value and he figured it was of no value; that Harwood agreed with Roberts that he thought it was of some value."

The plaintiffs further offered evidence of competent witnesses that the house at the time of the fire was worth some twelve or fifteen thousand dollars. One witness estimated the value at $15,980.

The following issues were submitted to the jury:

1. "Has there been an appraisal and award as to the amount of damages to which the plaintiffs are entitled under the insurance policy sued on in this action?"

2. "Was the appraiser, Dion A. Roberts, at the time of the alleged appraisal and award, interested?"

3. "If so, did the plaintiffs have knowledge of such fact at the time of the agreement for submission to appraisers and at the time of the appraisal and award?"

4. "Was the umpire, P. L. Harwood, at the time of the alleged appraisal and award, incompetent or interested?"

5. "Was the said umpire, P. L. Harwood, fraudulently influenced in the interest of the defendant by said Dion A. Roberts?"

6. "What amount are the plaintiffs, S. K. Young and others, entitled to recover of the defendant New York Underwriters Insurance Company?"

The first issue was answered by consent of the parties, and the jury answered the second, third, fourth, and fifth issues "Yes," and the sixth issue, "$9,000."

From judgment upon the verdict the defendant appealed.

*Don C. Young for plaintiffs.*
*Jones & Ward for defendant.*

BROGDEN, J. Was there sufficient evidence to be submitted to the jury upon the issues involving the competency and interest of Roberts, the appraiser, and Harwood, the umpire?

The parties entered into a valid and definite written agreement for submission of the controversy to appraisers. The appraisers duly took an oath. Himes was selected by the plaintiffs and Roberts by the defendant. The appraisers so selected chose Harwood as umpire to act only in matters of difference between the appraisers. The appraisers and the umpire viewed the premises and, on 29 July, 1933, they signed and delivered an award in which the sound value of the property was determined in the sum of $9,275, and the loss in the sum of $5,695.56.

Such award so made is presumed to be valid. *Hemphill v. Gaither,* 180 N. C., 604, 105 S. E., 183. Consequently, such award must stand, unless there is evidence of fraud, mistake, duress, or other impeaching circumstance. *Farmer v. Wilson,* 202 N. C., 775, 164 S. E., 356.

The policy of insurance provided that in the event the parties could not agree there should be selected "a competent and disinterested appraiser," and "a competent and disinterested umpire."

The plaintiffs assert that Roberts, the appraiser selected by the insurance company, was "interested," and that Harwood, the umpire selected by Roberts and Himes, was "interested," and that Roberts fraudulently procured Harwood, the umpire, to sign the award. While the allegations of attack and assault upon the award are broad and sufficient, the vital question is: Was there evidence to support such allegations?

At the outset, the evidence discloses that the appraisers and the umpire were all men of good character and experienced business men. There was no evidence that either Roberts or Harwood had ever been employed by the defendant or had acted for the defendant in any trans-

action. All three appraisers agreed that the sound value of the property was $9,275. Applying the three-fourths value clause, the loss would, therefore, have been $6,956.25, but Roberts contended that the first floor of the house was of some value, and that the loss should therefore be reduced by the amount of such value. Himes maintained the contrary view. This constituted the only difference between Himes and Roberts and, consequently, under the terms of the contract and agreement, this difference was the sole matter to be determined by Harwood. Nor was it denied that before Roberts had been appointed appraiser that he had been consulted by the plaintiffs to estimate the cost of rebuilding the dwelling, and that he had agreed to replace it for the sum of $5,700.

Was Roberts "an interested appraiser?" "An interested appraiser" is one who is partial, unfair, arbitrary and dominated by bias and prejudice for or against the parties or the property in controversy, or both, or has some pecuniary interest in the result or performance of the duties of appraiser. There is no evidence that Roberts had a money stake hidden somewhere in the controversy. So that the sole disqualifying circumstance as to him rests upon the fact that, as Himes put it, Roberts had previously acted as appraiser for both insurance companies and individuals. It would doubtless be considered a novel proposition to assert that because a lawyer of good character and professional skill had, in the course of his practice, represented insurance companies and individuals in settling insurance controversies, he was thereby unfitted, after taking an oath, to act impartially and fairly in an insurance matter with which he had no professional connection. Obviously the same test, in principle, would apply to appraisers.

Moreover, the plaintiffs knew beforehand that Roberts had made appraisals for insurance companies and, through counsel, protested by letter of 21 June, 1933. Notwithstanding such protest, however, the plaintiffs executed an agreement with the defendant and consented to the appointment of Roberts by the defendant on 8 July, 1933. Consequently, the Court is of the opinion that there was no evidence that Roberts was "an interested appraiser."

Was Harwood an interested appraiser? Himes, the appraiser for the plaintiffs, took Harwood to the scene of the fire prior to the appointment of appraisers, and upon that visit Harwood, according to the testimony of Himes, declared that the fire had resulted in a total loss. Thereafter, when the question of the selection of an umpire was raised, Himes suggested Harwood. After Harwood was appointed umpire and took an oath to perform his duties fairly and impartially, he agreed with Roberts that the portion of the house remaining after the fire was of some value. Himes testified that he suggested the appointment of Harwood as umpire because "Harwood had been a contractor and he had known him

7—207

some time; that he had a high regard for his opinion; that he knew his character and reputation; that he was a man of high character. . . . That so far as he and Mr. Roberts went their figures were almost the same, and that when Mr. Harwood took Roberts' figures away from the conference he was taking figures that Roberts and himself had very closely agreed upon." Himes also testified that at the final conference Harwood said: "Well, I am just taking Mr. Roberts' figures, adding for some trim in the two front rooms. . . . I am just going to let Mr. Roberts figure that trim, and he took Mr. Roberts' figures to show the value of the trim," etc. It is manifest that the alleged interest of Harwood rests upon two items of evidence, to wit: First, the fact that Harwood, before he was qualified as appraiser, had stated to Himes that he considered the loss as total, and that after he was appointed umpire and made further investigation, he had changed his opinion. There is no evidence that any influence whatever had been brought to bear upon Harwood by any person or party. Harwood, testifying as a witness at the trial, said that when Himes first took him out to the building that he had suggested to Himes that the building should be replaced by building on to the remainder of the first floor, and that Himes had represented that "they had a contract with the company whereby they could object to any and all material that remained there in the building." Thereupon Harwood said he told Himes that, "If you have a contract like that you have a total loss here," and that Himes had replied, "You stick to me on that." Second, that Harwood had accepted figures made by Roberts, and had made no figures for himself. There is no evidence that Roberts made any effort, by word or act, to influence the judgment or opinion of Harwood. Nor is there evidence that the figures made by Roberts did not represent an honest difference between his opinion and that of Himes.

Viewing the record in the light of the cold neutrality of the printed word, it is not thought that the mere fact that Harwood changed his opinion, or that he accepted the reasoning and figures of Roberts, is sufficient to constitute any evidence of either fraud or vitiating interest in the performance of his duty.

While the jury found that the sound value of the house was $12,000, nevertheless, so far as the appraisers were concerned, there could not have been any difference between them at any time in excess of $1,260.69. Therefore, the Court is of the opinion that there was no evidence to sustain the verdict on the second, fourth, and fifth issues.

The plaintiffs rely upon *Hill v. Ins. Co.,* 200 N. C., 502, 157 S. E., 599. In the *Hill case, supra,* there was no award at all, for the reason that the appraiser, Gladding, signed the paper conditionally and delivered it conditionally, and such condition was never complied with.

Moreover, the appraiser for the defendant had been "practically in his employ to make appraisals for four to six a year, . . . this unknown to plaintiff." Manifestly, the *Hill case, supra,* does not control the case at bar. See, also, *Geiger v. Caldwell,* 184 N. C., 387, 114 S. E., 497; *Farmer v. Wilson,* 202 N. C., 775, 164 S. E., 356; *Yelton v. McKinney,* 203 N. C., 785, 167 S. E., 70.

The interpretation of the record leads the Court to the conclusion that the motion for nonsuit should have been allowed.

Reversed.

SCHENCK, J., took no part in the consideration or decision of this case.