SPECTOR INDUSTRIES, INC. (FORMERLY BENTON-SPRY, INC.) v. SHIRLEY H. MITCHELL

No. 8121SC821

(Filed 2 August 1983)

1. **Cancellation and Rescission of Instruments § 5; Reformation of Instruments § 1.1— no rescission or reformation of contract**

    Defendant could not seek rescission of a contract for the sale of a trucking company and its affiliates where defendant has not tendered return of a sum paid to him pursuant to the contract and is therefore unable to restore the *status quo*. Nor may the contract be reformed on the ground of unilateral mistake where there was insufficient evidence of undue influence or of fraud in the inducement or execution of the contract.

2. **Accountants § 1; Contracts § 27— contract requiring audit—insufficient evidence of conflict of interest**

    In an action involving a contract for the sale of a trucking company and its affiliates by defendant to plaintiff at a purchase price which was to be adjusted after an accounting firm's audit of the net worth of the company and its affiliates, the evidence was insufficient to support a rejection of the audit on the ground of a conflict of interest or "double dealing" on the part of defendant's attorney who assisted in the negotiations and prepared the contract, defendant's general manager, or defendant's accountant who conducted the audit.

3. **Accountants § 1; Contracts § 27— contract requiring audit—gross mistake in audit—sufficiency of evidence**

    In an action involving a contract for the sale of a trucking company and its affiliates by defendant to plaintiff at a purchase price which was to be adjusted after an accounting firm's audit of the net worth of the company and its affiliates, the evidence was sufficient to be submitted to the jury on the issue of whether the audit should be rejected for gross mistake where there was evidence tending to show that the contract provided that auditing methods would be consistently maintained in order to keep the net worths of the companies consistent with the figures used for negotiation; the auditors wrote down a farm carried on the books at the cost of $655,535.00 to its appraised value of $360,000.00 in violation of the contract requirement that the method of valuation be consistently maintained; the auditors failed to delete a deferred income tax reserve of $128,445.00 which should have been deleted; the method of computation was not consistently maintained for prepaid tire and vacation accounts; company employee accounts were written off as bad debts while the employees still worked for the company; and approximately $100,000.00 was entered as "estimated unentered liabilities" when such an account had not been used previously.

APPEAL by defendant and cross-appeal by plaintiff from *Lewis, Robert D., Judge.* Judgments signed 28 January 1980, 11

February 1980, 29 February 1980, 21 March 1980, 26 March 1980, 24 April 1980, and 25 June 1980 in Superior Court, FORSYTH County. Heard in the Court of Appeals 6 June 1983.

This case involves a civil action in which plaintiff sought specific performance of a written Agreement and two Addenda by which defendant agreed to sell plaintiff a package of assets and companies for $9,345,332.00 subject to adjustment after audit by defendant's accounting firm, Ernst & Ernst. Plaintiff prayed that defendant be ordered to deliver the financial statements of companies audited by Ernst & Ernst pursuant to the Agreement so that the adjusted purchase price could be ascertained and final settlement made. Plaintiff also prayed the court to determine the amount of adjustments to promissory notes specified by the Agreement and Addenda.

By his Answer and Counterclaim, defendant contended that the audits, which reduced the purchase price cited in the Agreement by some four and one-half million dollars, were incorrect and that the Agreement should be voided either for fraud or mistake, or, in the alternative, that he was entitled to breach of contract damages at least in the amount of the purchase price set forth in the Agreement, $9,345,332.00, plus punitive damages.

Trifurcating the case for trial, the court elected to try first the issue of the "integrity of the audits." The scope of the jury trial was limited to this single issue to the exclusion of questions concerning whether the contract should be set aside and damages awarded for either fraud or mistake and whether any money was owed Mr. Mitchell.

The trial lasted nearly six weeks. The court submitted the following questions to the jury: (1) whether the audits had been conducted in accordance with generally accepted accounting principles; and (2) whether the audits should be rejected for (a) actual fraud, (b) conflict of interest, (c) undue influence, and (d) misfeasance, malfeasance, or gross mistake to such an extent that the audit was an irresponsible product. On the court's peremptory instructions, the jury answered the first question in plaintiff's favor. While finding no actual fraud or undue influence, the jury found with respect to the second question that the audits should be rejected (and, therefore, not be binding upon Mr. Mitchell) because of (1) the auditors' conflict of interest and (2) gross

mistake amounting to bad faith. The court later set aside the portions of the verdict favorable to defendant and entered judgment N.O.V. for plaintiff, thereby upholding the audits as a matter of law.

The court further entered partial summary judgment in plaintiff's favor regarding certain remaining claims alleged in defendant's counterclaim, including whether the written agreement should be rescinded and damages awarded for mistake or fraud. In addition, the court entered an order providing that prior to any decree of specific performance, it would sit as a "Court of Equity" and determine in an "audit of the audits" the amount of money, if any, due Mr. Mitchell and also whether plaintiff had been unjustly enriched in any respect.

The defendant's appeal from the judgments cites as error the court's (1) refusal to submit certain issues to the jury, (2) peremptory instructions on the first issue, (3) setting aside of the portions of the verdicts that favored defendant, (4) entering judgment for plaintiff on those issues returned in favor of the plaintiff, (5) entering summary judgment in favor of the plaintiff on issues the court had not submitted to the jury and concerning which the court had excluded evidence offered by the defendant at trial, (6) ruling that the court would determine without a jury the amount of money owed the defendant by the plaintiffs, (7) failure to pass upon defendant's motion for a new trial, (8) refusal to grant defendant's motion for injunction, and (9) additional orders or rulings that adversely affected the rights of the defendant.

Plaintiff cross-appealed from (1) the order of the court denying plaintiff's alternative motions for new trials, (2) failure of the court to rule on plaintiff's alternative motions for a new trial should the judgment N.O.V. be vacated or reversed by this Court, (3) that portion of the Order denying plaintiff's motion for partial summary judgment on defendant's claim that the audits were wrong, (4) that portion of the Order ruling that the audits were not binding until after examination of the audits by the Court of Equity, and (5) other orders or rulings that adversely affected the rights of the plaintiff.

*Womble, Carlyle, Sandridge & Rice, by H. Grady Barnhill, Jr., and Jimmy H. Barnhill for plaintiff-appellee.*

*Petree, Stockton, Robinson, Vaughn, Glaze & Maready, by Norwood Robinson, George L. Little, Jr., and Penni L. Pearson, for defendant-appellant.*

HILL, Judge.

Because this controversy has extended well over twelve years and involves numerous individuals, we briefly discuss the parties and some background information to promote an understanding of the issues raised.

*Shirley H. Mitchell* owned all the stock of Hennis Freight Lines, Inc. (Hennis), a North Carolina corporation principally engaged in freight hauling pursuant to authority granted by the Federal Interstate Commerce Commission, and its subsidiary, Highway Equipment Company. In addition, Mitchell owned all or part of the stock in:

1) Parkway Fuel Service, Inc., a West Virginia corporation.

2) M & M Tank Lines, Inc., a North Carolina corporation, and its subsidiary, M & M Tank Lines of Virginia, Inc., a Virginia corporation.

3) Confederate Vending, Inc., a North Carolina corporation.

4) Dixie Insurance Agency, Inc., a North Carolina corporation.

5) Tar Heel Supply Company, Inc., a North Carolina corporation.

6) Piedmont Motor Sales, Inc., a North Carolina corporation.

7) The Tire Center, Inc., a North Carolina corporation.

8) Hennis Freight Lines of Canada, Ltd., a Canadian corporation.

9) Dixie Rental Service, Inc., a North Carolina corporation.

10) Florida Refrigerated Services, Inc., a Florida corporation and a subsidiary of Hennis Freight Lines of Canada, Ltd.

*Jesse Phipps* was vice-president and general manager of Hennis Freight Lines. He was second-in-command to Mitchell and remained with the company when it was sold to Benton-Spry.

*William M. (Bill) Shelton,* a certified public accountant with Ernst & Ernst, had done accounting work for Hennis and Mitchell for years and remained in charge of the Hennis and affiliate audits after the transfer. He was Ernst & Ernst's auditor for Benton-Spry, Inc. after the transfer.

*Al Flynn* of the law firm York, Boyd and Flynn, was the attorney for Mitchell and Hennis during the negotiations and transfer of Hennis and affiliates.

*Kenneth Barlow,* the accountant Mitchell consulted after the Ernst & Ernst audit, was Mitchell's expert witness at trial.

*Benton-Spry, Inc.,* known as Spector Industries, Inc. when this appeal was filed, was a Delaware corporation to which Hennis and affiliates were sold.

*M. C. Benton, Jr.* was chief executive officer and board chairman of Benton-Spry and an accountant with many years of experience regarding trucking lines. He was a senior executive of McLean Trucking Company, a client of the accounting firm Ernst & Ernst which conducted the audits of Hennis and affiliates. Benton was among the principals who negotiated the purchase of Hennis and affiliates.

*Dennie Spry,* formerly employed by McLean Trucking Company, was a principal in Benton-Spry.

*George Doughton* of the law firm Spry, Hamrick and Doughton, was attorney for Benton-Spry, Inc.

*E. C. Peterson* was trustee of the Hennis Chapter X Reorganization and was chief executive officer until the company was released from Chapter X proceedings in April, 1974.

Mitchell built the Hennis company from a small carrier to the tenth largest motor freight line in the United States. In 1969, the financial condition of the company began to decline. Reasons for

the company's financial distress included: unpaid loans made by Hennis to Mitchell affiliates and to Mitchell personally; inability to hire and retain good personnel; inability to pay an IRS tax lien of $4,000,000.00; a labor union strike; and demand by a substantial creditor for payment of approximately $1,800,000.00 in indebtedness. Other creditors applied pressure. The company petitioned for a Chapter X Reorganization under the Bankruptcy Code which was granted. Mitchell and corporate management thereafter concluded that the only practical alternative was to sell the business.

Phipps approached Benton and Spry about their acquiring the Mitchell companies. Initially, Benton and Spry were interested in acquiring only Hennis Freight Lines and its subsidiary, Highway Equipment Company. Because of the volume of intercompany indebtedness, however, Mitchell and Phipps additionally proposed sale of all the affiliates to effect the most advantageous tax consequences.

THE CONTRACT

The contract is composed of three written agreements. The first, dated 20 November 1970, contains the exhaustive terms of the Agreement of Sale. An Addendum dated 20 November 1970 stipulates that sale and purchase is contingent upon a release of the businesses from Chapter X Reorganization proceedings. A second Addendum dated 7 December 1970 deletes from the original Agreement of Sale Hennis Freight Lines of Canada, Ltd., its subsidiary, Florida Refrigerated Services, Inc., and M & M Tank Lines, Inc. with its subsidiary, M & M Tank Lines of Virginia, Inc. This Addendum includes, however, an option to purchase the deleted motor carriers, the base sales price of $1,116,413.00 to be "increased (or decreased) by an amount by which the aggregate net worth of said carriers, *consolidated* with their subsidiaries" is greater or less than the base figure [emphasis ours]. This latter provision apparently amends that portion of the original agreement requiring payment for Hennis of Canada, M & M Tank Lines and their subsidiaries solely on the basis of *aggregate* book value.

Taken together, the documents call for defendant's sale to the plaintiff of (a) the stock of Hennis Freight Lines, Inc., and its subsidiary, Highway Equipment Company, Inc., (b) the stock of certain related companies called "affiliates" and their subsidiaries

and (c) certain other stocks and land. The original agreement provides that the purchase price is subject to adjustment pending the outcome of audits conducted by Ernst & Ernst using "generally accepted accounting procedures." The purchase price includes the following components:

| | |
|---|---|
| Hennis Freight Lines' intangible operating authority | $6,000,000.00 |
| Hennis Freight Lines' estimated net worth, excluding intangible operating authority | 500,000.00 |
| 106 acres of land on Interstate 40 at Winston-Salem-Greensboro-High Point Regional Airport, North Carolina, and 92.8 acres of land on Interstate 77, Charlotte, North Carolina | 1,124,000.00 |
| Gateway Life Insurance stock | 636,364.00 |
| Ten "affiliated" companies at net worth | 1,084,968.00 |
| Total | $9,345,332.00[1] |

In addition, the contract promises Mitchell $50,000.00 in consulting fees annually for five years, and the conveyance to him of a farm owned by Hennis in Patrick County, Virginia, for $250,000.00 to be credited against the purchase price paid by Benton-Spry.

According to the original Agreement, the purchase price of $9,345,332.00 is subject to adjustment reflecting the outcome of the Ernst & Ernst audit, depending upon:

(a) The amount by which the consolidated tangible net worth of Hennis and its subsidiary as of November 30, 1970, is greater or less than $500,000.00.

1. The 7 December 1970 Addendum amends the purchase price to $8,228,919.00, allowing for deletion from the original sales agreement of two affiliates and their named subsidiaries worth $1,116,413.00. After ICC approved their sale and Benton-Spry exercised its option to buy, the value of these companies was added to the amended purchase price, effecting a return to the original purchase price of $9,345,332.00.

(b) The amount by which the "aggregate net worth of the Affiliates" as of November 30, 1970, is greater or less than $1,084,968.00.[2] [The contract defines "affiliates" as those corporations owned directly by Mitchell. It does not list as affiliates those corporations (such as Dixie Rental Service, Inc. or Florida Refrigerated Services, Inc.) that are subsidiaries of the corporations owned by Mitchell. This definition and the generally accepted accounting principle that net worths of parents and subsidiaries be consolidated to eliminate duplication of values, form the basis for plaintiff's contention that the original agreement requires consolidation of the net worths of the parents and subsidiaries.]

(c) The amount by which any encumbrances on the Gateway Life Insurance stock and the land are greater or less than stated figures.

The Agreement also provides for the execution of a note by Mitchell to Benton-Spry for $3,502,000.00 or any other amount the audit determines he owes for personal loans from the companies. The Agreement further allows for offsets of principal and interest due under this note and others under the contract.

Benton-Spry assumed operational control of Hennis and its affiliates in early January 1971. The principal closing occurred on 8 February 1971. Benton-Spry received the stock of Hennis and all its affiliates except M & M Tank Lines and Hennis of Canada and their subsidiaries. At the closing, Mitchell received $1,000,000.00 which was put in escrow for the trustee in Reorganization and a note for $7,228,919.00. On 13 January 1972, the closing for M & M Tank Lines, Hennis of Canada and their subsidiaries was held, and a note for $1,116,413.00 was delivered to Mitchell. Both notes contain a provision for adjustments in accordance with the requirements of the contract. In 1981 Mitchell was delivered the deed to the farm in Virginia.

Based upon audits conducted by Ernst & Ernst from 1969 through August of 1970, Benton-Spry has concluded Mitchell has been fully compensated and refuses to make further payments

2. This figure is amended by the 7 December 1970 Addendum to "the sum of a deficit net worth of $31,345.00."

under the contract. Among the unpaid sums purportedly due are Mitchell's consulting fees.

Benton-Spry filed suit against Mitchell on 31 January 1975. The case proceeded to trial on the issue of the integrity of the audits in which (1) upon the court's peremptory instructions, the jury found the audits conformed to generally accepted accounting principles; and (2) while rejecting defendant's fraud and undue influence claims, the jury found the audits should be rejected based on (a) the auditors' conflict of interest and (b) gross mistake, a finding the court set aside by entering judgment N.O.V. for the plaintiff. Both parties appealed.

The issues on appeal are voluminous and variously stated by the parties. Nevertheless, we recognize two broad questions that encompass the issues raised: (1) May the defendant avoid the contract? and (2) May the defendant avoid the valuations determined by the Ernst & Ernst audits?

[1] Regarding the first question, we hold Judge Lewis correctly found as a matter of law that the Agreement and Addenda constitute the entire contract, and that the contract may not be rescinded or modified. Mitchell cannot seek rescission because he has not tendered return of Benton-Spry's $1,000,000.00 and is therefore unable to restore the *status quo*. Nor is reformation on grounds of mistake available. Repudiating any suggestion of mutual mistake, plaintiff contends the contract embodies the parties' intent; and a unilateral mistake is no basis for reformation in the absence of fraud, undue influence or the like. *Crawford v. Willoughby*, 192 N.C. 269, 134 S.E. 494 (1926); *Matthews v. Van Lines*, 264 N.C. 722, 142 S.E. 2d 665 (1965). We further find that evidence of fraud in the inducement or execution or of undue influence perpetrated on Mitchell by his advisors is lacking. The court correctly ruled on these issues. Therefore, we conclude the defendant cannot avoid his contract, and in so doing, we uphold the court's entry of summary judgment on questions concerning the composition and interpretation of the contract.

Regarding the second question, we focus on the propriety of the court's entry of judgment N.O.V. for plaintiff. We hold that while the court correctly entered judgment N.O.V. on grounds that there was insufficient evidence of conflict of interest, the

court improperly entered judgment N.O.V. on the issue of gross mistake.

The standard for judgment N.O.V. is fixed by G.S. 1A-1, Rule 50(b)(1) which states in pertinent part:

> [T]he motion shall be granted if it appears that the motion for directed verdict could properly have been granted.

Thus, the question presented upon review of the grant of judgment N.O.V. or directed verdict, *see Naylor v. Naylor*, 11 N.C. App. 384, 181 S.E. 2d 222 (1971), is whether the evidence, when considered in the light most favorable to the non-movant and allowing the non-movant every reasonable inference that may legitimately be drawn therefrom, is sufficient for submission to the jury. *Cutts v. Casey*, 278 N.C. 390, 180 S.E. 2d 297 (1971); *Nytco Leasing v. Southeastern Motels*, 40 N.C. App. 120, 252 S.E. 2d 826 (1979). The jury decides any issue of fact from which more than one conclusion can reasonably be drawn, *see Maness v. Construction Co.*, 10 N.C. App. 592, 179 S.E. 2d 816, *cert. denied*, 278 N.C. 522, 180 S.E. 2d 610 (1971), and resolves any discrepancies or contradictions in the evidence, *Clark v. Bodycombe*, 289 N.C. 246, 221 S.E. 2d 506 (1976).

I.

The Conflict of Interest Claims

[2]   In support of his argument that the trial court erred in setting aside the jury verdict, defendant Mitchell contends his attorney, Flynn, his accountant, Shelton, and the general manager of Hennis, Phipps, engaged in "double dealing." We find defendant's arguments are meritless.

Professional persons who work for potentially antagonistic parties walk a tight wire. Nevertheless, their task is not impossible. Various professions are governed by their own codes of ethics that provide guidelines for professional conduct. That a professional represents different parties in different capacities within a single transaction, as in the case before us, is not uncommon. Assuming all parties are aware of the duality of the relationship and the professional does not compromise a duty to either party, such an arrangement is often most advantageous. *See e.g.*, 3 C.J.S., Agency, Sec. 279.

Concerning potential conflicts of interest that may arise in this context, certain principles must be noted. When parties entrust a disputed matter to a third party for resolution, the third party's determinations are binding in the absence of some disqualifying conduct. *See Elec-Trol, Inc. v. Contractors, Inc.*, 54 N.C. App. 626, 284 S.E. 2d 119 (1981), *disc. rev. denied*, 305 N.C. 298, 290 S.E. 2d 701 (1982). As the party challenging the results of the determination made by the third party, the defendant has the burden of establishing the disqualifying conduct. In the absence of such evidence, directed verdict is proper. A simple challenge that the audit is the subject of disqualifying conduct is insufficient. Such disqualifying conduct must be proven as a fact to the jury. *Young v. Insurance Co.*, 207 N.C. 188, 176 S.E. 271 (1934). Nor may one object regarding matters he could reasonably have anticipated would form the basis for objection based on the facts known to him. *Garfield & Co. v. Wiest*, 432 F. 2d 849 (2d Cir. 1970), *cert. denied*, 401 U.S. 940 (1971); *see Construction Co. v. Management Co.*, 37 N.C. App. 549, 246 S.E. 2d 564, *disc. rev. denied*, 295 N.C. 733, 248 S.E. 2d 864 (1978). In addition, one party who attempts to "stack the deck" in his favor is estopped to complain if it develops that the third party is biased in the other party's favor, particularly if the potential for bias was the same in each instance. *Firemen's Fund Ins. Co. v. Flint Hosiery Mills*, 74 F. 2d 533 (4th Cir.), *cert. denied*, 295 U.S. 748 (1935).

In support of his argument to reinstate the jury's finding of a conflict of interest, defendant contends the evidence is sufficient to set aside the audits for bias or partiality. *See Brooke v. Milling Co.*, 84 S.C. 299, 66 S.E. 294 (1909). Defendant argues that his accountant's ties to plaintiff, which were initially unknown to him, precluded the "independent" audit required by the parties' contract and the ethical standards of the accounting profession. He faults his attorney and general manager with having pecuniary interests in plaintiff that compromised their duties to him.

## A.

Regarding his attorney, Al Flynn, who assisted in the negotiations and prepared the contract, Mitchell contends a conflict of interest arose when Flynn: (1) accepted employment by Benton-Spry to secure the transfer of operating rights, (2) continued to represent Hennis on old legal matters after the stock

transfer to Benton-Spry, (3) as a creditor of Hennis and affiliates, filed a claim in the Hennis bankruptcy proceeding for several thousand dollars, (4) after the transfer, accepted stock in Benton-Spry in exchange for the debts owed him by Hennis and, in addition, bought stock in Benton-Spry from one of his law partners, and (5) advised Mitchell to sign the 7 December 1970 Addendum in which the valuation of the four affiliates was on an aggregated rather than a consolidated basis, reducing the purchase price by some $640,000.00.

Each of these instances is satisfactorily explained and none indicates Flynn was double-dealing. Flynn did assist Benton-Spry by filing required applications for transfer of operating rights, but he did so with Mitchell's approval, believing he was jointly representing the parties in this particular endeavor. His continuing legal representation of Hennis was in defense of claims that had arisen before the Reorganization; he was paid by Peterson, the Hennis trustee. In any event, there is no evidence that his continued representation compromised his professional judgment regarding the sale. The claim Flynn filed in the bankruptcy was for services rendered to Hennis before the Reorganization. Flynn's subsequent acceptance of Benton-Spry stock in satisfaction of the claim and his acquisition of Benton-Spry stock *after* Mitchell discharged him is simply not evidence of any wrongdoing.

Finally, defendant cites as evidence of disloyalty and conflict of interest Flynn's recommendation that Mitchell sign the second Addendum that Benton-Spry prepared on the advice of Shelton, Ernst & Ernst's lead auditor. Shelton had advised attorneys for Benton-Spry that valuation of two named motor carriers and their subsidiaries (i.e., M & M Tank Lines and its subsidiary, M & M Tank Lines of Virginia; Hennis Freight Lines of Canada and its subsidiary, Florida Refrigerated Services) should be determined on a consolidated rather than on an aggregated basis, as originally provided, to avoid duplication of values. Flynn, who had an accounting degree and had in fact passed part of the CPA exam before deciding to pursue a legal career, reviewed the proposed change and understood its significance. Elimination of the discrepancy in valuation brought the contract within generally accepted accounting principles, and Flynn appropriately advised Mitchell to sign.

### B.

Jesse Phipps had worked for Hennis for some ten years before the sale and was general manager at the time of the transfer. He was principally responsible for persuading Benton and Spry to purchase the Mitchell companies.

As evidence of a conflict of interest, Mitchell charges that Phipps: (1) knew Benton because Benton was an officer of McLean Trucking Company for which Phipps had once done audit work and that he was acquainted with Shelton as well, (2) as a subscriber to shares of Benton-Spry stock, was an agent of Benton-Spry during the negotiations, (3) continued as general manager of Hennis under the direction of Benton-Spry, and (4) owed debts to Hennis and various affiliates which later were written off the books, resulting in a substantial reduction in the purchase price.

Taking Mitchell's contentions singly, we find no evidence that Phipps's professional acquaintance with Benton and Shelton created any conflicts. The existence of these relationships, of themselves, is insufficient evidence for jury consideration on the conflict of interest issue. One in top management customarily knows others in the trade and becomes acquainted with company auditors. Regarding his shareholder status in Benton-Spry, Phipps purchased the stock after the transfer while still employed by the Hennis trustee. His acquisition of stock after the contracts were negotiated and signed is hardly evidence of an agency relationship between Phipps and the Benton-Spry principals during negotiations. While Phipps remained general manager of Hennis after the transfer, he was employed by Peterson, the Hennis trustee — not Benton-Spry; defendant's allegation of a conflict of interest based on this fact is therefore without merit.

Mitchell contends that when lead auditor Shelton in negotiations proposed an addendum to consolidate values of certain parent and subsidiary corporations, Mitchell asked for an explanation, to which Phipps replied: "Don't worry about that. It's just a bunch of highly technical accounting matters. Let's not worry about that now." Mitchell argues that Phipps's response is evidence from which a jury could conclude Phipps had become an agent of Benton-Spry. We disagree. The contract required that the audited net worths of the companies be based on generally ac-

cepted accounting principles. Use of the initially proposed aggregated method of valuing net worths would have resulted in duplication of values in contravention of generally accepted accounting principles. While it does indicate that Phipps preferred to postpone discussion of the proposed change, his alleged failure to explain does not provide sufficient evidence of conflict of interest for submission to the jury. In any event, the Addendum which substituted the consolidated for the aggregated method of valuation was apparently understood by attorney Flynn, who had studied accounting, was familiar with generally accepted accounting procedures and advised Mitchell to sign.

We are concerned, however, about the manner in which Phipps's accounts were written off. We will discuss the issue later in this opinion.

## C.

Mitchell contends that Shelton, who supervised the audits of Hennis and the affiliated companies, and his employer, Ernst & Ernst, committed acts of wrongful conduct from which a jury could find a conflict of interest existed. We disagree.

As provided by the contract, the accounting firm of Ernst & Ernst was to be "independent." Defining the functions of independent public accountants, Mitchell's expert witness, Mr. Barlow, testified:

> . . . our primary responsibility is to the users of financial statements upon which we report. We are hopefully independent, which involves — we are objective in our evaluation of those financial statements which, [sic] hopefully we make decisions with unbiased judgment.
>
> * * * * * * * * * *
>
> Yes, I think there is a difference [in the responsibility of the auditor performing an audit which will be used by the parties with regard to the purchase and sale of the company as opposed to a regular audit which would be published for the company shareholders] . . . I think there are different effects involved.

Shelton testified he was familiar with the rules of the accounting profession regarding independence:

[I]t's a mental attitude more than anything else . . . . Independence is one of the generally accepted auditing standards.

Before negotiation and execution of the sales contract, Mitchell and the Benton-Spry principals knew that they and their employees had and would continue to have contacts with Ernst & Ernst. These parties were familiar with auditing procedures, and they agreed Ernst & Ernst should perform the audit.

Shelton supervised past audits of the companies. He also attended negotiations as counsel to Mitchell on tax matters, but only after determining his presence would not conflict with Ernst & Ernst's policy to avoid participation in their clients' negotiations. That he apprised the parties of problems in the valuation methods is not evidence of bias or conflict of interest; it is evidence of an effort to correct an error in the contract. Shelton's delay in consulting Mitchell about the proposed audit adjustments is immaterial, particularly since Shelton knew the audit was to be performed under the direction of the trustee, Peterson. Shelton acknowledged he could have discussed the adjustments with Mitchell "piecemeal," but decided to review the entire audit with Mitchell and his attorney when the audit was completed. None of these actions evidences a lack of independence sufficient for jury consideration on the conflict of interest question.

Ernst & Ernst's responsibility for the audit was described in the contract:

There will be furnished to the Buyer after the Closing, the audited balance sheets of Hennis and each of the Affiliates as of November 30, 1970, certified by Ernst & Ernst, independent certified public accountants and auditors.

*The audited financial statements as of November 30, 1970, certified by Ernst & Ernst, certified public accountants, will be correct and complete and will be prepared in accordance with generally accepted accounting practices consistently maintained. Such balance sheets will present a correct and complete statement of the financial condition and assets and liabilities (whether accrued, absolute, contingent or otherwise) of Hennis and each of the Affiliates as of November 30, 1970. . . . The costs of having prepared the aforesaid audit*

and financial statements with respect to the Affiliates and their subsidiaries shall be paid by the Seller. Seller shall pay any additional costs associated with the audit of Hennis and its subsidiary over and above the cost that would normally be charged to Hennis and its subsidiary for its annual audit of December 31, 1970. [Emphasis added.]

In short, Ernst & Ernst was to produce a correct and complete statement of the financial condition, assets and liabilities (whether accrued, absolute, contingent, or otherwise) of Hennis and its affiliates as of November 30, 1970, the date of transfer of ownership. Ernst & Ernst was not to be an umpire or arbiter. Although its employees talked with many people, including Peterson, Benton, Spry, and Flynn, there is no evidence of any individual doing more than supplying the information solicited. Nor do we find evidence of wrongdoing by Ernst & Ernst and Flynn in allocating costs between the parties to the contract based on services rendered. That Ernst & Ernst may have wanted Benton-Spry's business in the future is not evidence of wrongdoing as contended by Mitchell.

Finally, we find no basis in the record for defendant's assertion that Benton-Spry "stacked the deck" by controlling the information reviewed by Ernst & Ernst. Ernst & Ernst already had background information resulting from their prior audits of Hennis. Indeed, the diversity of location of the affiliates and Benton-Spry's unfamiliarity with Hennis records would make any effort to control the auditors' information nearly impossible. Although Benton and Spry were on the premises as of early January 1971, the trustee was legally in charge of Hennis operations. They conversed with the auditors, but information pertinent to the period before 30 November 1970 was provided the auditors by appropriate employees of Hennis. Thus, evidence of contacts between Benton-Spry principals and the auditors is insufficient to raise the conflict of interest issue.

Having examined the record, we conclude the evidence is insufficient to create a conflict of interest issue sufficient for jury consideration. We therefore uphold the trial court's entry of judgment N.O.V. in this regard.

## II.

### The Gross Mistake Claim

[3]   While upholding the judgment N.O.V. on the issue of conflict of interest, we conclude the trial court erred in entering judgment N.O.V. on the jury's rejection of the audit based on gross mistake.

As a background to the discussion of this issue, an understanding of an audit is helpful. The term "generally accepted accounting practices" (GAAP) includes the rules by which an audit is conducted. The rules have been codified by the American Institute of Certified Public Accountants and are followed generally by all auditors. Yet the rules themselves allow for variations in result. For example, there are several methods by which depreciation charged off as a current expense can be ascertained under GAAP (e.g., straight line, sum of the digits, declining balance methods); each method produces different sums to be charged off as a current expense. When the current expense is charged to reserve, the book value of the asset varies, depending on the method of depreciation used. Yet, all methods are correct and conform to GAAP.

GAAP allows for the exercise of individual judgment. When the audits involve extensive bookkeeping entries, it is not customary to check each item. Instead, certain tests are applied to the accounts in accordance with auditing standards and procedures. Obviously, this area requires exercise of the auditor's judgment. Based upon the test results, the auditor makes adjustments to reflect the accounts shown on the books. The auditor also exercises judgment in making other adjustments, such as setting up reserves for doubtful accounts and, in some instances, writing off accounts as bad debts. Here again, education, experience and knowledge of the particular industry are used by the auditor in making any entries the auditor determines to be within the scope of generally accepted accounting procedures.

To keep the net worths of the companies consistent with the figures used for negotiation, the parties herein provided by contract that auditing methods would be consistently maintained. This simply required the auditor to ascertain the method used the previous year and apply the same method. Spry allegedly told Ernst & Ernst he did not want an audit report like the one that

had arisen from the 1969 Hennis audit in which Ernst & Ernst offered "no opinion" of the company's audited financial statements. Spry's concern was legitimate. A "no opinion" audit would be worthless in Benton-Spry's effort to secure financing.

The very existence of the 1969 "no opinion" audit reveals something about the condition of the books. Many records were not kept current. One of the Ernst & Ernst auditors testified the records were "much less than we would have normally expected for the company in missing documentation and other things of that nature."

We do not propose to examine every adjustment made by Ernst & Ernst in connection with the audits of the various companies. Nevertheless, an examination of several adjustments supports our conclusion that the evidence sufficiently indicates the auditors committed gross error to such an extent that the audit is an irresponsible product. We hold that the trial court erred in setting aside the jury verdict rejecting the audit for this reason.

We confine our examination to whether there is sufficient evidence of gross error in the audit to submit the question to the jury. We find instructive the case of *McDonald v. MacArthur Bros. Company*, 154 N.C. 122, 69 S.E. 832 (1910), in which the Court upheld the following jury instruction:

> If you believe from the evidence that the estimate referred to contained such error of judgment as amounted to a mistake so gross as to necessarily imply bad faith and to amount to a fraud upon the rights of the plaintiff, you should answer the . . . issue "Yes," and this would be so though there is no evidence of an intention to commit a fraud or to act in bad faith.

*Id.* at 126-127, 69 S.E. at 834.

The Supreme Court also approved the following instruction:

> The contention of the plaintiff is that this paper writing, called "final estimate," was grossly erroneous and the plaintiff insists that the amount which you will find due was so far from being insignificant and was such a considerable sum in comparison with the aggregate of the whole work done, that any court and any jury ought to say (the plaintiff insists) that

it was not only erroneous, but that it was gross error and such as would amount to a legal fraud.

*Id.* at 127, 69 S.E. at 834.

Hence, the question whether the audit should be set aside on the foregoing grounds is one for the jury. *McDonald v. MacArthur Bros. Company, supra.*

Evidence from which the jury could find gross mistake includes the following:

1. The trading date was 30 November 1970. Prior to that date, the farm was carried on the books as an asset at $655,535.00. The auditors wrote down the sum to $360,000.00, the farm's appraised value. Benton-Spry had contracted to sell the farm to Mitchell at the bargain price of $250,000.00. The write-down resulted in a removal of some $295,000.00 of Mitchell's contracted-for bargain. The $655,535.00 figure represented the cost of the farm to Hennis. Use of the appraised value method of valuation was not a "consistently maintained" procedure and was thus in violation of the contract requirement.

2. The balance sheet showed a reserve of $128,445.00 for deferred income taxes. The company was operating at a loss with operating loss carryovers and investment credits of $6,640,000.00 and $960,000.00, respectively. If the company operates at a profit in the future these sums could be used as offsets against income and income taxes. Mitchell's CPA, Barlow, said the $128,445.00 reserve should have been deleted, which would have increased the value of the assets by that amount. We conclude the jury properly considered this item in determining whether the audit should be set aside for gross mistake.

3. In several other areas, *e.g.*, a prepaid tire account and vacation accounts, the method of computation does not appear to have been consistently maintained.

4. Principal company employee accounts were written off as bad debts when they were still employed: a) B.C. Brandon appears to have owed $2,605.00 to Hennis and over $11,000.00 to the Tire Center. These sums were written off even though he was employed at an annual salary of $20,000.00; b) W.R. Moore Company owed Hennis and the affiliates in excess of $300,000.00

which was written down. Yet under its Reorganization plan, every other creditor of W.R. Moore was paid; c) Phipps owed some $4,000.00 each to Hennis and the Tire Center which he contended were actually advances for travel expenses. These accounts were apparently reserved or written off without requiring vouchers for travel expenses; d) Shelton, Ernst & Ernst's lead auditor, wrote off $100.00 on an account receivable owed by himself.

5. Approximately $100,000.00 was entered as "estimated unentered liabilities," an account that was not entered in 1969, violating the requirement of accounting procedures "consistently maintained."

In all, approximately $4,400,000.00 worth of write-downs were entered on the books. Benton-Spry contends that when the conveyance of the farm, the down payment of $1,000,000.00, the note due from Mitchell, and the write-downs are added, it owes Mitchell nothing further.

The jury heard the testimony concerning the audit adjustments. There were sufficient questions of fact for the trial court to submit the issue of gross mistake. The jury decided the audit was grossly in error. Whether there is *any* evidence of an issue is a question for the judge. Whether there is sufficient evidence for a positive finding on the issue is a question for the jury. *Wittkowsky v. Wasson*, 71 N.C. 451 (1874). The trial judge improperly granted judgment N.O.V. on this issue.

CONCLUSION

A substantial portion of the sales agreement has been closed. The stocks have been transferred and notes with guidelines for adjustments have been delivered. A deed to the farm has been delivered and accepted. The question of Mitchell's fees as a consultant is not resolved.

Having found no support for the trial court's entry of an order appointing itself as a court of equity to determine whether and how much money is due Mitchell, we strike the court's order. We affirm the trial court's entry of judgment N.O.V. on the conflict of interest claim. We reverse the trial court's entry of judgment N.O.V. on the jury's rejection of the audit for misfeasance, malfeasance or gross mistake and reinstate the jury verdict on

this issue. We remand the case to the trial court for a new jury trial which will include the following issues:

1. What amount, if any, is the defendant entitled to recover under the note for $1,116,413.00 dated 13 January 1972 and given in payment for the two affiliates and their subsidiaries deleted from the original Agreement?

2. What amount, if any, is the defendant entitled to recover under the note for $7,228,919.00 dated 8 February 1971 for the balance of the companies minus the $1,000,000.00 down payment?

3. What amount, if any, is the defendant entitled to recover for consulting fees under the contract?

4. What amount, if any, does Mitchell owe Benton-Spry under the contract?

Both parties raise other issues that we do not address. They are moot or immaterial in light of our decision.

Affirmed in part.

Reversed in part and remanded.

Chief Judge VAUGHN and Judge BECTON concur.